STATE OF TEXAS V. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY
AND AMERICAN EXPRESS COMPANY.

No. 1491.  Decided February 26, 1906.

**1.—Antitrust Law—Railway—Express Company.**

Railroads being required by statute (Rev. Stat., art. 4540) to furnish to all express companies equal facilities for doing business over their lines, any combination of their capital, skill or acts by a railway with one express company which would limit or narrow the scope to be given to the business of others over such line would be a violation of the trust law of 1903.  (Pp. 525, 526.)

**2.—Same—Contract—Exclusive Rights.**

A contract between a railway and express company by which the former bound itself merely not to contract with other express companies to do business on its road might not prevent it from furnishing them facilities for doing such business without contracting to do so; but where the rights granted are spoken of by the contract as "exclusive facilities," and are only to be awarded by the railway when compelled by legislative or judicial proceedings, and in that event the contracting express company is to have credit for the sums paid by other companies on the amount due from it under its contract, the obstacles interposed to the admission of other companies to do business, evidence the intention to make the rights of the contracting company exclusive, and to create and carry out a restriction on others in the free pursuit of the business.  (P. 526.)

**3.—Same.**

While the mere purpose without the combination does not constitute the offense, the formation of such purpose and the agreement upon a contract by which it is to be carried out, in which contract the capital, skill or acts of both are to be used, completes the offense.  (P. 527.)

**4.—Same—Contracts Prior to Enactment.**

Whenever, after the Act begins to operate, a combination for the prohibited purposes is found to exist, it falls within the terms of the law.  The fact that it was formed by contract made before the law was passed is immaterial, if it was in active existence thereafter.  (Pp. 527, 528.)

**5.—Same—Retroactive Law—Police Power—Impairing Contract.**

The constitutional prohibition against impairing the obligation of a contract does not apply to a legitimate exercise of the police power by the state in prohibiting the continuance of things already in existence which are so injurious to the rights and interests of citizens generally as to justify the exercise of such power, though their continuance may be provided for by contracts previously made.  (Pp. 527, 528.)

**6.—Same—Unlawful Contract.**

Whatever limitations there may be to the exercise of the police power to impair existing contracts, they do not apply to a contract already prohibited by a statute existing when it was made, e. g., the application of the antitrust law of 1903 to a contract for exclusive rights to an express company made unlawful by article 4540 of the Revised Statutes.  (P. 528.)

**7.—Trusts—Control of Rates by Commission.**

The fact that the regulation of the rates of both railways and express companies is placed under the control of the Railroad Commission does not exempt them from penalties for forming combinations made unlawful by the antitrust law.  (Pp. 528, 529.)

**8.—Pleading.**

The allegation that the parties to a contract constituting an unlawful combination under a law passed after it was entered into, continued to treat it as

valid and executed and carried it out after the law went into effect, was suffi-
cient, as against a general demurrer, to charge them with acts violating the
law.   (P. 529.)

Questions certified from the Court of Civil Appeals for the Third
District, in an appeal from Travis County.

*R. V. Davidson,* Attorney-General, and *Warren W. Moore,* District
Attorney (*Lackey & Lewright* and *Allen & Hart,* of Counsel), for appel-
lant.—The allegations in the petition showed a violation of the Antitrust
Act of 1903.   Bill of Rights, sec. 26; Constitution of the State of Texas,
secs. 1, 2 and 5, art. 10, and secs. 3 and 5 of art. 12; Rev. Stat., art.
4540; arts. 15, 16 and 17, Criminal Code; Brenham v. Brenham
Water Company, 67 Texas, 561; Gulf, C. & S. F. Ry. Co. v. The
State, 72 Texas, 404; Coal Co. v. Lawson, 89 Texas, 394; Waters-
Pierce Oil Co. v. The State, 19 Texas Civil Appeals, 1; Wells-Fargo
Express Comany v. Williams, 71 S. W. Rep., 314; Thompson v San
Antonio & A. P. Ry. Co., 32 S. W. Rep., 427; United States v. Trans-
Missouri Freight Association, 166 U. S., 290; United States v. Joint
Traffic Association, 171 U. S., 505; Diamond Glue Company v. United
States Glue Company, 187 U. S., 611; Pearsall v. Great Northern
R. R. Co., 161 U. S., 646; Louisville & N. R. R. Co. v. Kentucky, 161
U. S. Rep., 677; Doyle v. Continental Ins. Co., 94 U. S., 535.

*Baker, Botts, Parker & Garwood* and *Alexander & Thompson,* for
appellee, American Express Co.

*T. S. Miller, Fiset & McClendon* and *Clarence H. Miller,* for appellee,
Mo., K. & T. Ry. Co.—The antitrust Acts in question were intended to
prohibit combination generally, which restrain trade, or suppress compe-
tition, but not those contracts within the purview of the Railroad Com-
mission law.   The Commission under that law has exclusive power and
is charged with the exclusive duty to protect the public against unjust
or excessive rates on the part of railway and express companies, and
hence the contract in question is not within the meaning of the antitrust
laws.   Thorpe v. Adams, L. R., 6 C. P., 135; Moore v. Bell, 95 Texas,
157; Rev. Stat., arts. 4561-4584; San Diego Water Co. v. San Diego
Flume Co., 108 Cal., 549; State v. Shippers Compress Co., 95 Texas,
603.
   The contract in question was entered into before the Antitrust Act of
1903 and plaintiff's petition does not allege that the exclusive feature
of the contract was carried out in such a way after that Act became ef-
fective, as to violate the terms of the Act.   We submit that the allega-
tions are insufficient to show a violation of the law, if it applied to the
contract in question.   See also United States v. Dietrich, 126 Fed.
Rep., 671; Oregon Co. v. Windsor, 20 Wal., 64; Erie Ry. Co. v. Union
L. Co., 6 Vroom, 244; Stephen v. Southern P. Co., 109 Cal., 95; 9
Cyc., 575-6; Brewster v. Kitchell, 1 Salk, 198.   The petition should
allege an intentional violation of the law.   State v. Compress Co., 95
Texas, 607; 6 A. & E. Enc. of Law, 2d ed., 840, and note, and 864
and note.

The contract in question was not a violation of either the Antitrust Acts of 1899 or of 1903, because the express company was not a competitor of the railway company, and the railway company in giving the express company the exclusive privilege of transporting express matter over its lines merely operated a part of its own business through an instrumentality which it had the right to select.   Northern Securities Case, 193 U. S., 197; Welch v. Phelps & B. Windmill Co., 89 Texas 655; Gates v. Hooper, 90 Texas, 565; Lewis v. Weatherford, etc., Ry. Co., 36 Texas Civ. App., 48; Express Co. Cases, 117 U. S., 1; Wiggins Ferry Co. v. Chicago & A. Railway Co., 27 S. W. Rep., 570; Donovan v. Pennsylvania Co., 120 Fed. Rep., 215; Barney v. Oyster Bay & H. Steamship Co., 67 N. Y., 301; Kates v. Atlanta B. & C. Co., 16 Am. & Eng. Ry. Cases (N. S.), 140; Pullman Palace Car Cases, 139 U. S., 89; Welch v. Phelps & B. Windmill Co., 89 Texas 655; Anderson v. Rowland, 44 S. W. Rep., 912; Atchison T. & S. F. Ry. Co. v. Denver & N. O. R. R., 110 U. S., 667.

The contract in question is not a "combination" as defined in the Act of 1903, and the petition therefore fails to state a violation of the terms of that Act.

In Addyston Pipe Co. case, 85 Fed. Rep., 271, the rule is stated to be "where the main and controlling purpose of the contract is a lawful purpose and the restriction of competition is merely collateral or incidental to the main purpose, such incidental and contingent restraint of trade is not within the purpose of the statute."

In United States v. E. C. Knight, 156 U. S., 1, it was decided that "the fact that trade or commerce might be indirectly affected, was not enough to entitle complainant to a decree."   To same effect is United States v. Traffic Association, 171 U. S., 505.

In the express cases, 117 U. S., page 1, and the Pullman Palace car cases, 139 U. S., 89, the Federal Supreme Court holds that the contract between the railroad company and an express company or a sleeping car company, whereby the latter acquire exclusive rights on the lines of railroads is not monopolistic in its character nor opposed to public policy.   These utterances by the highest federal court fully establish the proposition that the contract in question looked at from the most extreme standpoint, was only a partial restriction in competition, and was not unreasonable at common law or contrary to public policy.   If it was not so at common law then it was not so, if our argument holds good, under the language of the Antitrust Act of 1903.   United States v. Freight Association, 166 U. S., 341; Hopkins v. United States, 171 U. S., 578; United States v. Workman's A. Council, 26 L. R. A., 158; Addyston P. & S. Co. v. United States, 175 U. S., 211, and 95 Texas, 603; Addyston Pipe Co. case, 85 Fed. Rep., 271; 175 U. S., 211.

We think the case is distinguishable from the cases heretofore held to violate the antitrust law, and within the doctrine announced in Gates v. Hooper, 90 Texas, 563.   Vanderweghe v. American Brewing Co., 61 S. W. Rep., 526.   See also White Dental Co. v. Hertzberg, 51 S. W. Rep., 355.

The contract in question is not an unreasonable restriction in trade or upon competition and is not illegal because the Antitrust Act of 1903

applies only to unreasonable restraints in trade and substantial restrictions in competition.

If the Antitrust Act of 1903 prohibits reasonable restrictions in trade and competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, then it is void because it deprives the prohibited persons from exercising the constitutional right of making contracts. Dobbins v. City of Los Angeles, 195 U. S. Rep., 223; Lawton v. Steele, 152 U. S., 133; Express cases, 117 U. S., 1; Pullman cases, 139 U. S., 89.

If the Act of 1903 prohibits reasonable restrictions upon trade and competition, then the statute takes away the appellees' liberty and property without due process of law, and it is an impairment of rights protected by the fourteenth amendment to the Federal Constitution.

The contract in question appears from the plaintiff's petition to have been entered into before the passage of the Antitrust Act of 1903, and that Act is an ex post facto law and a law impairing the obligations of the contract within the meaning of the United States Constitution as regards their contract. Express cases, 117 U. S., 1; Pullman cases, 139 U. S., 89.

The Antitrust Act of 1903, the violation of which is complained of, is contrary to the fourteenth amendment to the Federal Constitution and denies the appellees the equal protection of the law, because in the 17th section of the Act, it provides that nothing in the act shall be construed to destroy any rights of the state to recover penalties or forfeit charters of domestic corporations, or prohibit foreign corporations from doing business in the state for acts committed before the Act takes effect, but does not provide for the recovery of penalties either against an individual or a foreign corporation for acts committed before the Act takes effect. Connolly v. Union Pipe Line Co., 184 U. S., 540.

WILLIAMS, ASSOCIATE JUSTICE.—This case is submitted upon the following certificate from the Court of Civil Appeals for the Third District:

"This is a case now pending in the Court of Civil Appeals of the Third Supreme Judicial District of Texas, wherein the State of Texas in the District Court of Travis County sought to recover from the appellees penalties for an alleged breach and violation of the Antitrust Acts of 1899 and 1903. A general demurrer in the court below was sustained to the petition, and the case dismissed, from which judgment the state of Texas has appealed. The petition is as follows:

"'First. That the state of Texas is the plaintiff herein and is represented by Warren W. Moore, her district attorney in and for the Twenty-sixth Judicial District of Texas, and acting under the authority and by the direction of the attorney-general of the state of Texas. That said district attorney applied to the Railroad Commission of Texas for permission and direction to bring this suit, but such permission and direction were declined by said Railroad Commission of Texas, because they had no jurisdiction in the matter and had nothing to do with the case. The defendants are the Missouri, Kansas & Texas Railway Company, of Texas, a railroad company incorporated under the laws of the state of

Texas, and the American Express Company, a joint stock company organized under the laws of the state of New York, doing business in Texas and having about fifteen hundred stockholders or members of said stock company residing in various parts of the country, whose names and residences are unknown to the plaintiff.

"'Second. That on the days and dates hereinafter mentioned, the defendant, Missouri, Kansas & Texas Railway Company of Texas, was engaged in operating a railroad from Denison to Galveston with various branches and feeders, and was a common carrier for hire in the state of Texas, being the owner of and in control of a railroad as above set out. That the defendant, the American Express Company, along with three other express companies, the Pacific Express Company, the Wells-Fargo Express Company and the United States Express Company, were each and all engaged in the express business in the state of Texas, and were carrying on such business as common carriers for hire over the various lines of railway within the state of Texas, and were in active competition with each other in such express business; that they, the said express companies, competed actively with each other in the rates charged, the promptness of service rendered for a given rate, the facilities afforded shippers and the public generally in dealing with them, in the courtesy of employes, and in the nature and character of the services rendered, and in many other ways were competing and did compete and could compete with each other in the state of Texas.'"

The certificate here sets out the allegations of the petition as to a contract made between the parties defendant January 31, 1900, and as to that contract and the acts done under it, being in violation of the Antitrust Act of 1899, which allegations are omitted for reasons hereinafter stated. The petition then proceeds to allege the making of a second contract as follows:

"Seventh. Plaintiff says that heretofore, to wit: On the 23d day of September, A. D. 1902, the defendant, the Missouri, Kansas & Texas Railway Company of Texas, entered into a contract and agreement with the defendant, American Express Company, a joint stock association doing business in the state of Texas, whereby it was agreed by and between said railway company and said express company among other things as follows:

"(a) That the railway company agreed to transport all the express matter of the express company to and from all stations upon its lines of railroad and branches which were then owned and operated by it and which might thereafter be owned and operated by it during the life of said contract.

"(b) The railway company further agreed that 'none of its employes for himself, or for the railway company, shall be allowed during the continuance of this agreement to transmit money, valuable packages, goods or merchandise of any kind whatsoever, except regular passengers' baggage and supplies for the railway company's eating houses upon the passenger trains of the said railway company, except that the railway company reserves the right to transport dogs in its passenger trains when accompanied by the owner, and also to transport corpses.'

"(c) It was further agreed that the railway company would not

contract with any party or parties to do an express business over said road, or any portion thereof, during the existence of the agreement.

"(d) It was further agreed that if the railway company constructed, leased, operated or acquired other lines during the life of the agreement, the express company should have the same exclusive facilities over all such lines insofar as the railway company could legally grant such facilities, 'it being understood that if the railway company by its trackage arrangement with other railway companies which it may deem best to make hereafter, or if it compelled by legislation or judicial proceedings to grant to any other express or transportation company facilities for carrying on an express business on its lines, or any part of the same, the revenue derived from the facilities so afforded such other express or transportation company shall be credited to the express company in its payment provided for under the terms of the agreement,' and it was further agreed that the compensation to such other transportation company or companies should not be less than the compensation provided for by the contract to be paid to the express company for the same service.

"(e) It was further agreed that the express company would transport, free of charge, over its lines, matters of any kind, property of the railway company, when such shipments did not exceed twenty pounds in weight, between any points reached by said express company and would charge on shipments exceeding twenty pounds in weight of the property of the railway company to and from any points reached by the express company off of the line of the railway company and the Missouri, Kansas & Texas Railway Company (of Kansas) 75 percent of its regular tariff on such shipments, and it was provided that the above should apply to the business of the Southwestern Development Company, 'being an associated company of the railway company.'

"(f) The express company further agreed that it would not issue any local rates per hundred pounds between points on the railway company's lines 'which shall be less than one and one-half times the railway company's freight rate per hundred pounds on the same commodity between the same points,' unless consent to the contrary had been obtained from the traffic manager of the railway company, but it was provided that the express company shall be permitted to make such rates between competitive points as will enable it to compete successfully with other express companies operating on other lines of railway, the express company agreeing to notify the railway company of any reduction of rates made on account of competition, when such competitive rates are reduced to one and one-half times the freight rates of such commodity, the express company agrees that no further reduction shall be made in such competitive rates without the consent of the railway company.

"(g) It was agreed that the sum of $7,732.12 shall be paid by said express company quarterly to said railway company and that if 50 percent of the gross receipts of such company from traffic on the lines thereof should be in excess of that sum that such 50 percent should be paid.

"(h) It was further agreed by and between said parties that said

contract should become effective and be in force from and after the 1st day of February, 1903, and should continue in force for a period of ten years."

The petition then charges violations of the Act of 1899 in the making and carrying out of this contract up to March 31, 1903, when the Act of that year became a law, and proceeds:

"Ninth. Plaintiff says that after the 31st day of March, 1903, and up to and including the trial of this case, the defendant railway company and defendant express company, aforesaid, continued to treat said contract, last aforesaid, that is to say, the contract entered into on the 23d day of September, 1902, as a valid and binding contract between said parties, and executed and carried out said contract.

"Tenth. That by the execution and carrying out of the contract last aforesaid, after the 31st day of March, 1903, said defendant railway company and said express company each became and was a trust, and each entered into a combination of capital, skill and acts by and with persons, firms, corporations and associations of persons, to wit: each defendant with the other for the following purposes:

"1. To create and carry out restrictions in trade and aids to commerce and in preparation of products for market and transportation and to create and carry out restrictions in the free pursuit of a business authorized and permitted by the laws of this state and said combination tended to carry out and create such restrictions.

"2. To prevent and lessen competition in the transportation of merchandise, products and commodities, and to prevent and lessen competition in aids to commerce and in the preparation of products for market and transportation.

"3. To fix and maintain a standard or figure whereby the price of articles or commodities of merchandise, products and commerce and the cost of transportation should be affected, controlled and established.

"4. To make, enter into, maintain, execute and carry out a contract, obligation or agreement by which the parties thereto bound themselves not to transport any article or commodity below a common standard or figure, and by which they agreed to keep the price of such article, or charge for transportation at a fixed or graded figure and by which they might affect and maintain the price or cost of transportation and to preclude free and unrestricted competition among themselves in the transportation of articles or commodities of transportation and by which they agreed to pool, combine and unite an interest which they had in connection with a charge for transportation.

"Eleventh. Plaintiff further says that by the contract and agreement aforesaid and the execution and carrying out of the same after said 31st day of March, 1900, said railway company and said express company entered into and carried out an agreement:

"1. Creating and tending to create and carry out restrictions in trade and commerce and aids to commerce and in transportation and in the free pursuit of business authorized and permitted by the laws of this state, and

"2. Fixing, maintaining and increasing the price of merchandise pro-

duce and commodities and the preparation of products for market and transportation, and

"3. Preventing and lessening competition in the transportation of merchandise, produce and commodities and preventing and lessening competition in aids to commerce and in transportation, and

"4. Fixing and maintaining a standard and figure whereby the price and cost of transportation is affected, controlled and established, and

"5. By which the said parties, bind and have bound themselves not to transport articles and commodities, and by which they agree to keep the price of charges for transportation at a fixed and graded figure, and by which they affect and maintain the price and cost of transportation and the cost of transportation between them and themselves and others, and to preclude a free and unrestricted competition among themselves and others in the transportation of articles and commodities and the business of transportation, and by which they agree to pool, combine and unite their interest in connection with the charge for the transportation of express matter, whereby such charge is affected.

"And plaintiff says that by the execution of the contract aforesaid and the carrying out of same after the 31st day of March, A. D. 1903, said defendant railway company and said defendant express company each formed a trust and a monopoly and a conspiracy in restraint of trade and thereby violated the laws of the state of Texas, and especially the Act of March 31, 1903, and thereby each became liable to plaintiff for the penalties denounced and provided by said statute, to wit: the sum of fifty dollars per day for each day from and including the 1st day of April, 1903, to and including the date of the trial of this case, an aggregate of $20,000 and for the sum of $20,000 plaintiff now asks judgment against said defendant railway company, and for the sum of $20,000, plaintiff asks judgment against said express company.

"Twelfth. That during the month of September, 1903, the Railroad Commission of Texas promulgated a general tariff of rates and classifications of freights and all express matter to be hauled by the express companies doing business in the state of Texas, such rates and classifications to govern in the transportation by said express companies of all express matter wholly within the state; that the defendant, the American Express Company, together with the other express companies doing business in the state of Texas, applied for and obtained from the United States Circuit Court an injunction against the Railroad Commission of Texas, restraining them from promulgating or enforcing such rates and classifications; that such tariff was a general tariff and covered every sort of express matter; that said defendant express company and said other express companies claim in their bill upon which they obtained such injunction that the Railroad Commission is without authority of law to fix and regulate charges to be made by them; that they also claim that they had no right on various grounds to enforce such rates and classifications, and said suit has been pending since September, 1903, and is now pending and can not be tried or finally disposed of by the court until January, 1905.

"And plaintiff prays for judgment severally against said defendants for the sums hereinbefore prayed to be adjudged against them' respec-

tively, and it prays for judgment for costs and for such other relief as it may be entitled to.

"In view of the fact that we are reliably informed that there are thirty or more cases pending in the court below of practically the same nature as this case, and that are dependent upon a decision hereof; and in view of the public interest involved in the question, so that an early and final decision may be reached, we have concluded to certify the questions raised by the plaintiff's petition to your honorable court. However, there is one question pointed out in appellee's brief as supporting the ruling of the trial court which we have agreed upon. It is insisted by appellees that the trial court correctly sustained the demurrer, because the attorney-general in an action to recover penalties for a breach of the antitrust statutes in question, so far as they affect railway and express companies, could not maintain the same without permission or consent of the Railroad Commission of Texas. The petition does contain an averment that the Railroad Commission did not give its consent to the bringing and filing of this suit, but it affirmatively appears upon the face of the petition that it was instituted under the consent and direction of the attorney-general. Without comment or stating the reasons that have influenced us in the ruling, we deem it only sufficient to say that we are of the opinion that the attorney-general could maintain the action without the consent or permission of the Railroad Commission.

"It will be observed that the petition specifically points out and calls the court's attention to the grounds relied upon as showing and indicating wherein the contract as described in the petition comes within the condemnation of the Antitrust Acts of 1899 and 1903. Such being the case, we deem it unnecessary to make the questions propounded more specific than to merely ask the court whether the plaintiff's petition states a cause of action, and whether the trial court erred in sustaining the general demurrer. Therefore we propound to the Supreme Court the following question:

"Was the contract in question, as it is alleged and described in plaintiff's petition, in violation of either the Antitrust Act of 1899 or of 1903, in any of the respects specifically insisted upon by the plaintiff in the petition?"

Those allegations based upon the two contracts intended to show violations of the Act of 1899 are omitted for the sake of brevity, because it was conceded at the argument that the petition did not show that Act had been violated. It may be stated, however, that the terms of the first contract alleged were in substance the same as those of the second. In view of the admission made by counsel for the state, which is regarded as proper, we deem it unnecessary to discuss the questions put with reference to the Act of 1899, but content ourselves with answering that no violation of that Act is shown.

The Act of 1903, so far as we need to consider its provisions, is as follows: "That a trust is a combination of capital, skill or acts by two or more persons, firms or corporations or associations of persons, or either two or more of them for either, any or all of the following purposes:

"1. . . . To create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this state.

"3. To prevent or lessen competition in the . . . transportation . . . of merchandise, produce or commodities.

"4. To fix or maintain any standard or figure whereby the . . . cost of transportation . . . shall be in any manner affected, controlled or established.

"5. To make, enter into, maintain, execute or carry out any contract, obligation or agreement by which the parties thereto bind, or have bound themselves not to sell, dispose of, transport or to prepare for market or transportation any article or commodity, or to make any contract of insurance at a price below a common standard or figure, or by which they shall agree in any manner to keep the price of such article or commodity or charge for transportation or insurance, or the cost of the preparation of any product for market or transportation at a fixed or graded figure, or by which they shall in any manner affect or maintain the price of any commodity or article or the cost of the transportation or insurance or the cost of the preparation of any product for market or transportation between them or themselves and others, to preclude a free and unrestricted competition among themselves or others in the sale or transportation of any such article or commodity or business of transportation or insurance or the preparation of any product for market or transportation, or by which they shall agree to pool, combine or unite any interest they may have in connection with the sale or purchase of any article or commodity or charge for transportation or insurance or charge for the preparation of any product for market or transportation whereby its price or such charge might be in any manner affected."

To answer the questions certified it is necessary only to bring to bear upon the contract alleged the first subdivision of the statute and inquire whether or not the contract shows a combination of capital, skill or acts to create or carry out a restriction in the free pursuit of a business authorized or permitted by law, and in determining this we may further restrict the inquiry to the effect intended by the parties upon the businesses of other express companies. Whether or not a restriction in the pursuit of those businesses was contemplated must be determined by ascertaining their lawful scope in respect of the right of such companies to pursue them upon the railroads of the state. In 1885 it was decided by the Supreme Court of the United States that "railroad companies are not required by usage, or by the common law, to transport the traffic of independent express companies over their lines in the manner in which such traffic is usually carried and handled," and that "railroad companies are not obliged either by the common law or by usage to do more as express carriers than to provide the public at large with reasonable express accommodations; and they need not, in the absence of a statute, furnish to all independent express companies equal facilities for doing an express business upon their passenger trains." Express Company Cases, 117 U. S., 1. This may be regarded as the rule of law existing in this state until 1887 when was enacted a statute now forming article 4540 of the Revised Statutes, which was evidently passed in order to remedy what the legislature, agreeing with the views expressed

by the judges who dissented in the Express Company Cases, regarded as a defect in the existing law. It reads as follows:

"Art. 4540. Every railroad company operating a railroad within this state shall furnish reasonable and equal facilities and accommodations, and upon reasonable and equal rates, to all corporations and persons engaged in the express business, for the transportation of themselves, agents, servants, merchandise and other property, and for the use of their cars, depots, buildings and grounds, and for exchanges at points of junction with other roads."

Unquestionably this authorized and permitted express companies to pursue their businesses on all the railways controlled by state legislation, with "equal and reasonable facilities and accommodations, and upon equal and reasonable rates." Thus the scope of this business, as "authorized or permitted" by law, is defined, and any combination of the kind denounced by the antitrust statute, the carrying out of which would limit or narrow such scope, is necessarily one to create or carry out a restriction in the free pursuit of the business. This proposition can not be made plainer by any amount of elaboration. Ft. Worth & D. C. Ry. Co. v. The State, ante p. 34; 12 Texas Ct. Rep., 1002-3.

The contract in question shows by its own terms, that its purpose was to secure to the express companies, as far as it was in the power of the parties to do so, the exclusive right to do an express business upon the railroad, and to exclude other express companies from the enjoyment of like rights. It is true that by clause (c) the railroad company only bound itself not to *contract* with others to do an express business on its road, and, if this were all, it might be urged that all of the equal and reasonable facilities, accommodations and rates exacted by the law might be accorded without express contract; but the purpose to grant an exclusive right to the express company is made too plain for argument by the succeeding clause. Clause (d) expressly calls the rights granted "exclusive facilities" and plainly evinces the understanding that they shall not be given to any one else unless such action be compelled by legislation or judicial proceedings, and that, should this be done, the express company shall have credit for the sums paid by other companies. This clause shows plainly the intention that the only express business to be conducted on this road should be that of the contracting express company, and that that company should receive the benefit of the earnings of the railroad company from the business of any other express companies which it might be compelled to admit to its lines, which stipulation is made, presumably, in return for sufficient consideration moving from the express company to the railroad company. The obstacle such an agreement interposes to the admission of other companies to the facilities given to them by the statute is easily understood, seeing that every other express company is to be charged for the facilities to be enjoyed by it the same price that the favored company is to pay as the consideration for everything the railroad company agrees to do for it, including the undertaking, in effect, to exact such prices from all other companies for the benefit of this one. We conclude that there was the purpose to create and carry out a restriction in

the free pursuit of a business, and next inquire whether or not there was a combination of capital, skill or acts to accomplish that purpose.

The capital, the skill and the acts of the railroad company were employed in conducting its business of a common carrier, which included the transportation of the servants of the express company and the express matter controlled by it. The capital, the skill and the acts of the express company were employed in conducting, as a common carrier, the express business upon the railroad. The two businesses, although the same instrumentalities are, to an extent, used by the two companies, in forwarding each, may be kept distinct and there is not necessarily a combination of any character in the mere fact that they are thus carried on. But when the two companies unite in the purpose defined and frame their contract with a view to its accomplishment, all that is promised on one side being the consideration for all that is promised on the other, the combination of their capital, their skill and their acts for the common purpose is complete. The capital, skill and acts of each being employed in its business, when they agree upon the unlawful purpose and to so direct their businesses as to effect that purpose, they necessarily combine to that extent the capital, skill and acts by which such businesses are sustained. While the mere purpose without the combination, does not constitute the offense, the formation of the purpose and the agreement upon a contract by which it is to be carried out, in the execution of which contract the capital, skill or acts of both are to be used, does complete the offense. All of the power for mischief inherent in the union of two or more for the accomplishment of a purpose injurious to others is thus exerted, and this is the consideration that led the Legislature to prohibit such combinations for purposes which are not made unlawful when entertained by one.

The contract through which this combination was formed was made before the Act of 1903 was passed and the question whether or not there has been a violation of that Act must be determined by inquiring whether or not it applies to such combinations formed before, but carried out after, it took effect. The language in which the offense is defined and described requires an affirmative answer. A trust is defined as a combination for certain purposes. Whenever, after the Act begins to operate, such a combination is found to exist it falls within the terms employed. All such combinations are declared by section 4 to be illegal and are prohibited. This language makes their existence a violation of the Act and other sections impose penalties upon parties causing such violation. The fact that a combination may have been formed before the statute took effect is immaterial if it is in active existence thereafter. The statute has no retroactive or ex post facto operation, and applies only to offenses occurring after its enactment; the offense does not consist in the formation and existence of the combination before the law went into operation, but in the persistence of the parties in it after it has become unlawful. This the terms of the Act make reasonably clear when they define the existence of certain elements to constitute a trust, and provide that one of the elements may be the purpose "to carry out" restrictions and the like, and make the penalties provided (section 11), apply for each day the offense is "continued." That such is the correct

interpretation of such statutes is held by the Supreme Court of the United States in United States v. Trans-Missouri Freight Association, 166 U. S., 342. But it is said that this interpretation of the statute would render it unconstitutional as impairing the obligation of a valid contract. The answer is that the state may, in the exercise of its police power, prohibit the continuance in the future of those things already in existence which are so injurious to the rights and interests of its citizens generally as to justify such an exercise of the power whether the continuance of the things is provided for by contract or not. The same power which may upon sufficient occasion, destroy other property of the citizen to secure the general welfare, may, to the same end, destroy the binding obligation of contracts. The constitutional inhibition against the impairment of the obligation of contracts is not a limitation upon the police power when exercised within its legitimate sphere, and therefore the mere objection that an exercise of that power impairs the obligation of a contract does not reach the true question, which is whether or not the attempted exercise is within the scope of the power exercised. It is unnecessary in this case to go into any extended examination of the question as to the extent of this power. If we had before us a contract which was originally lawful and reasonable in itself and which, although falling within the literal language of the statute, could not justly be regarded as so injurious to the state or its citizens as to afford reasonable grounds for its destruction, a different question would be presented. It is true that there are limitations upon the power of the Legislature to either strike down contracts already made, or unreasonably and arbitrarily to restrict the liberty of citizens in contracting in future, but there is no occasion for applying them here. This contract was, as we have seen, made in the face of a statute then existing, and was not a reasonable, and can hardly be said to have been a lawful one; and it is wholly unnecessary to pursue an inquiry which might arise with reference to contracts of a different character.

The argument is advanced that because of the existence of the laws creating the Railroad Commission and investing it with power to regulate the rates to be charged by railroad and express companies, combinations between them do not fall within the reason and purpose of the statute which we are considering and which was passed subsequently to those just referred to. The Act of 1903 expressly deals with combinations affecting transportation, competition therein, and the cost thereof, and it is improbable that the Legislature intended to omit from its operation the two most prominent kinds of carriers engaged in transportation, combinations between whom would have greater effect on the things intended to be protected than the combinations of any other persons. Extensive powers are given to the Railroad Commission by which unjust practices among such carriers may be prevented or curtailed, and it is doubtless true also, that there was no purpose, in enacting laws to suppress trusts, to interfere with the regulation by it of matters placed under its control. But it is certainly not unreasonable to suppose that the Legislature may have thought that further checks might be necessary or useful by way of penalties prescribed for combinations calculated to impede the carriers' full performance of their duties

and to defeat the laws enacted to define and enforce those duties. The language of the statute undoubtedly embraces railroads and express companies and no rule of construction would authorize the courts to take them out of its operation.

A contention like this was advanced by the railroad companies, in United States v. Traffic Ass'n, supra, and United States v. Joint Traffic Ass'n, 171 U. S., 505, based on the Federal Antitrust Act and the Interstate Commerce Act, with much greater reason in the provisions of those statutes than can be found in the terms of ours, but was held to be unfounded.

Finally, it is claimed, that the petition fails to show a violation of the Act of 1903 in that it does not allege that the features of the contract, constituting the unlawful combination, were carried out after the law went into effect. The natural meaning, or the reasonable intendment, at least, of the allegation that, after the law was passed, the defendants "continued to treat said contract . . . as a valid and binding contract between said parties, and executed and carried out said contract" is that the whole contract was so treated. This was sufficient at least to meet a general demurrer.

While we have discussed the case upon the application of the first subdivision of the statute, the reasons we have stated lead obviously to the conclusion that there was also a combination for the purpose mentioned in the third subdivision. Questions much more far-reaching would arise under the fourth and fifth subdivisions, when applied to clauses (d), (f) and (g) of the contract, upon a discussion of which we find it unnecessary to enter. To do so would require a consideration of how far a railroad company in adjusting its business to that of an express company, to be carried on upon its road may regulate the terms upon which it is to be done so as to protect itself and its own business, whether or not stipulations made for that purpose are reasonable and, if so, valid, although coming within the general language of the subdivisions of the statute referred to, whether or not such questions could be determined from a mere inspection of the contract or would require for their decision the statement in the petition charging violations of the law of other facts upon which the legality of the things charged might depend, and probably other matters that need not be stated. These in most part have not been argued and as a decision of them is not essential to an answer to the questions asked by the Court of Civil Appeals, we deem it inadvisable to go further than we have done.

We answer that the petition showed a violation, in the particulars stated, of the Act of 1903, and that the court erred in sustaining a general demurrer.