SMITH *et al. v.* LOUISVILLE & N. R. Co.

(*Nashville.* December Term, 1914.)

CARRIERS. Carriage of live stock. Delivery. Private stockyards.
Acts 1897, ch. 10, sec. 17, prohibiting the giving of undue pref-
erences by a common carrier to a particular person, locality,
or description of traffic, or the subjecting of a particular per-
son, locality, or description of traffic to unreasonable preju-
dice, does not require the carrier to make deliveries of live
stock shipments in car load lots at private stockyards main-
tained by the consignee, and a contract with the Union Stock-
yards Company, by which the carrier agreed to make all such
deliveries at the company's yards at the carrier's expense, is
valid, since the nature of the stock, the necessity for quaran-
tine, and the danger and delay which would be caused by extra
switching thereby made necessary is sufficient to justify a dif-
ferent rule from that applied to inanimate freight, which the
carrier must deliver on a private track.

Acts cited and construed: Acts 1897, sec. 17, ch. 10; Acts 1887,
ch. 104.

Cases cited and approved: Central Stockyards Co. v. Louisville
& N. R. Co., 118 Fed., 113; Central Stockyards Co. v. Louisville
& N. R. Co., 192 U. S., 568; Atlantic Express Co. v. Wilmington,
etc., R. Co., 111 N. C., 470; Texas v. Missouri, etc., R. Co., 99
Tex., 516; Kates v. Atlanta Baggage & Cab Co., 107 Ga., 636;
Dingman v. Duluth, etc., R. Co., 164 Mich., 332.

Cases cited and distinguished: Covington Stockyards Co. v.
Keith, 139 U. S., 128; Butchers' & Drovers' Stockyards Co. v.
Louisville & N. R. Co., 67 Fed., 35; Express Cases, 117 U. S., 1.

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County.—
W. C. CHERRY, Special Chancellor.

STOKES & STOKES, for appellants.

KEEBLE & SEAY, for appellees.

MR. JUSTICE WILLIAMS delivered the opinion of the
Court.

The bill of complaint was filed in this cause by
Thomas, Smith & Co., a copartnership, and the Nash-
ville Abattoir Association, a body corporate, against
the Louisville & Nashville Railroad Company and the
Nashville, Chattanooga & St. Louis Railroad Com-
pany, for the purpose of compelling these defendant
railway companies, by mandatory injunction, to de-
liver at the places of business of the respective com-
plainants car load lots of live stock consigned to either
complainant from points within this State, and for the
purpose of impeaching, as being invalid, a contract in
existence between the railway companies and the
owners of the Nashville Union Stockyards.

The corporation which owns and operates the Union
Stockyards in the city of Nashville intervened by peti-
tion and is to be deemed a codefendant. Exhibited
with this petition was a copy of the contract attacked
as above stated.

The bill alleges, in substance, that the complainant
Abattoir Association is engaged in the business of
slaughtering live stock for market, maintaining
therefor a plant with all facilities for loading and

unloading live stock and caring for same; that the defendant railway companies have in operation a spur track extending to its plant and past the property leased from the Abattoir Association by the complainant firm of Thomas, Smith & Co.

It is further alleged that said firm had leased a portion of the land owned by its corporate cocomplainant for the purpose of operating a stockyard and that it was equipped for the doing of such business.

It is set forth that the railway companies deliver on the spur track referred to all kinds of freight in car load lots, except live stock; that repeated demands have been made on defendants to have intrastate shipments of car load lots of live stock consigned to complainants delivered on this spur track, but that the railway companies had refused to do this, insisting that all such consignments must be first delivered by them to the Union Stockyards, following which they would make car load deliveries to the complainants' places of business on receipt of a switching charge of $3 per car; that the property and plant of the Abattoir Association is as accessible as that of the Union Stockyards, and that the refusal of the railway companies is arbitrary, discriminatory, unjust, and illegal, and was due to the fact that these carriers had entered into a contract with the owners of the Union Stockyards, by the terms of which those yards were made an exclusive depot in the city of Nashville for live stock purposes.

The carrier companies answered, and the grounds of their defenses are indicated in substance by what is to

be said below in the treatment of the legal phases of
the litigation. They admitted the existence of the con-
tract between them and the Union Stockyards manage-
ment, which contract in part is as follows; the railway
companies being parties of the first part:

"Eight.—The first parties agree to pay the second
parties the sum of fifty cents per car load as above
for each car load of stock loaded or unloaded at said
yards from or for the roads of the first parties.

"Ninth.—The first parties agree to maintain and
keep in good order and repair the necessary tracks,
switches, siding, and all other necessary means for
loading and unloading, and other suitable and proper
conveniences or appurtenances usually and custo-
marily furnished by railroads to stockyards.

"Tenth.—The first parties further agree that they
will not lease or rent any of their grounds in the city
of Nashville for the establishment of a stockyards, or
other stockyards in the city of Nashville, and that they
will establish no other stock depot in said city of Nash-
ville, and that they will deliver and cause to be de-
livered to said second parties all live stock shipped to
any party or parties in the city of Nashville. The first
parties hereby agree to make the stockyards of the
second parties their stock depot for said city, and, un-
less compelled to do so by law, will not deliver at any
other point or points in the said city, and agree to de-
liver all live stock shipped to the city of Nashville at
the yards of the second parties."

The situation of the cause was such that the learned
special chancellor was of opinion that it could be dis-

posed of without proof being taken; his view being that the contract was void and that complainants were entitled to the relief sought. On appeal, the court of civil appeals was of opinion that on its face the contract was not void, and it reversed the chancellor's ruling, and remanded the cause to the chancery court and to rules for proof relative to the main issue and some subsidary issues which we shall not in this opinion set forth.

It is to be observed that the complainants present two phases in their complaint and insistence that they have been subjected by the defendant to discriminatory treatment: The corporate complainant, the aspect of a slaughterhouse concern; and the firm complainant, that of a stockyards concern. We are of opinion, however, that they may be treated as not dissimilar contentions, for all the purposes of treatment in this opinion.

The federal courts have had under review in several cases the contention herein made by complainants in relation to interstate shipments, but our attention has been called to no case in which any State court has been called upon to pass upon the question as affecting intrastate shipments.

The statute of this State on which the insistence of complainants is based is the Act of 1897, ch. 10, regulating railroads, section 17 of which is as follows:

"That it shall be unlawful for any corporation to make or give any undue or unreasonable preference or advantage to any particular person or locality, or

any particular description of taffic, or to subject any particular person, company, firm, corporation or locality, or any paticular desciption of traffic to any undue or unreasonable prejudice or disadvantage.''

The federal decisions, while of course only persuasive on this court in the formulation of a rule of State law, shed much light upon this contest.

The first case in which the claim that it was the duty of a railway company as a common carrier to serve all offering stockyard customers alike in deliveries of live stock to be made at their plants was *Covington Stockyards Co.* v. *Keith,* 139 U. S., 128, 11 Sup. Ct., 469, 35 L. Ed., 73, where the court, speaking through Mr. Justice Harlan, held that a contract somewhat similar to the one before us was not enforceable, because the customer was required to pay a special charge to the stockyard company for its receiving into its yards his stock. But the court took occasion to say further:

''We must not be understood as holding that the railroad company, in this cause, was under any legal obligations to furnish, or cause to be furnished, suitable and convenient appliances for receiving and delivering live stock at other points on its line in the city of Covington, where persons engaged in buying, selling, or shipping live stock chose to establish stockyards. In respect to the mere loading and unloading of live stock, it is only required by the nature of its employment to furnish such facilities as are reasonably sufficient for the business of the city. So far as the record discloses, the yards maintained by the appellants are,

for the purpose just stated, equal to all the needs, of that city, of shippers and consignees of live stock; and if the appellee had been permitted to use them, without extra charge for mere 'yardage,' they would have been without just ground of complaint in that regard; for it did not concern them whether the railroad company itself maintained the stockyards, or employed another company or corporation to supply the facilities for receiving and delivering live stock it was under obligation to the public to furnish.''

The next case was that of *Butchers' & Drovers' Stockyards Co.* v. *Louisville & N. R. Co.*, 67 Fed., 35, 14 C. C. A., 290, decided by Taft, Lurton, and Severens, Circuit Judges; the opinion being by Judge Taft. In that case was involved a contract relative to the property or plant with which we are concerned in this litigation. It was there said:

''The difference between the duties of a common carrier in the transportation of live stock and of dead freight has been remarked upon more than once by the supreme court of the United States [citing cases]. The evidence clearly shows that the delivery of car loads of dead freight and the receipt of them by side tracks is much less onerous and involves much less care and responsibility for the railroad company than would the receipt of live stock from a private yard by side track. One of the chief reasons why deliveries [by a railroad in carload lots on side tracks] are possible and consistent with the business of a large trunk line is that a loaded car may stand upon a side track for

hours, or even a day, until the railroad company finds it convenient to back its engine down and take it. Such delays are utterly impossible in the proper transportation of car loads of live stock. When they are loaded, they must be moved. The evidence shows that in other respects the supervision of the switching of cattle cars would be much more expensive and troublesome to the railroad than dead freight. Indeed, it hardly needs expert evidence to establish it. There is no ground, therefore, for any charge of unjust discrimination against the defendant railway company as between complainant and the Front street shippers."

The court then proceeded to quote and apply the above-quoted language of the supreme court in the *Keith Case,* and the ruling of the circuit court of appeals in the above case was in turn cited with approval by the supreme court in *Central Stockyards Co.* v. *Louisville & N. R. Co.,* 192 U. S., 568, 24 Sup. Ct., 339, 48 L. Ed., 565.

The circuit court of appeals, in *Central Stockyards Co.* v. *Louisville & N. R. Co.,* 118 Fed., 113, 55 C. C. A., 63, 63 L. R. A., 213 (affirmed as above indicated), had announced the doctrine that where a railroad company has by contract with a stockyard company made adequate provision for the discharge of its duty as a common carrier with respect to live stock shipped over its line to a city, it is not required by the common law or by the Interstate Commerce Act (Act Feb. 4, 1887, ch. 104, 24 Stat. 379) to make deliveries of stock to other stockyards in the same city.

Prior to the date of any of the above decisions the supreme court had, on the same principle, ruled that an agreement by a railway company to grant facilities of transportation to one express company did not require it to grant like facilities to all express companies which might demand them. The court, speaking through Chief Justice Waite, after demonstrating the practical points of inconvenience to result from a different ruling, said that a railway company is not a common carrier of common carriers, and further:

"So long as the public are served to their reasonable satisfaction, it is a matter of no importance who serves them. The railroad company performs its whole duty to the public at large and to each individual when it affords the public all reasonable express accommodations. If this is done, the railroad company owes no duty to the public as to the particular agencies it shall select for that purpose. The public requiring the carriage, the company may choose its own appropriate means of carriage, always provided they are such as to insure reasonable promptness and security." *Express Cases,* 117 U. S., 1, 6 Sup. Ct., 542, 628, 29 L. Ed., 791.

Since the passage of the Interstate Commerce Act there has been no deflection on account of its provisions from this line of decision in the cases that follow; and among them are decisions of the highest tribunals of several States.

Nor has it been considered that modern statutory regulations, such as our own quoted above, have

wrought a change in the law touching the question. Thus, in *Atlantic Express Co.* v. *Wilmington, etc., R. Co.*, 111 N. C., 470, 16 S. E., 393, 18 L. R. A., 397, 32 Am. St. Rep., 810, it was held that a statute making it unlawful for any common carrier to give undue and unreasonable preference to any person, company, firm, corporation, or locality did not require equal facilities to be given to an express company for carrying on its business over a railway, unless the railway company held itself out as a common carrier of such companies. See cases collated in note to *Texas* v. *Missouri, etc., R. Co.*, 99 Tex., 516, 91 S. W., 214, 13 Ann. Cas., 1072; at 5 L. R. A. (N. S.), 783, and, on kindred subject-matters, *Kates* v. *Atlanta Baggage & Cab Co.*, 107 Ga., 636, 34 S. E., 372, 46 L. R. A., 431; *Dingman* v. *Duluth, etc., R. Co.*, 164 Mich., 332, 130 N. W., 24 32 L. R. A. (N. S.), 1185, and note.

In our opinion there are reasons of inconvenience as fully apparent and compelling in the instant case as there are in those cases which involve the validity of exclusive contracts for facilities with express companies and sleeping car companies for a ruling in favor of the defendant companies. It is not to be presumed that the law places on a common carrier a burden likely to become so great as to cause it to stagger under the weight, in compelling the carrying of numerous express cars, the sleeping cars of every and various offering companies, or in the delivery of live stock to the plant or place of business of each customer who may

claim to be engaged in the slaughterhouse business or the business of stockyarding.

In the making of such deliveries the railway companies would be onerated with the consequences due to the hazard to live stock in the jars and lurches incident to the numerous movements of the cars in their being placed on spur tracks used by such offerers. The stock would have to remain on board cars during the delay incident to the switching operations, a matter affecting their being fed and watered. Further, there are regulations of the federal and State governments requiring live stock under certain conditions to be inspected and quarantined, and under other conditions to be treated by being dipped for protection against certain diseases, and facilities for all such required purposes could not reasonably be furnished at many loading places in the same city.

The fact that inanimate or dead freight may be required to be delivered to customers on the spur tracks at their plants is no sufficient reason for a like rule being applied to live stock. The above considerations afford the refutation, not to mention the differences in the duty of the carrier in reference to the two kinds of freight, long recognized by the law.

We are of opinion that the court of civil appeals pronounced the correct decree in the case. Affirmed.