# BUTCHERS' & DROVERS' STOCK-YARDS CO. v. LOUISVILLE & N. R. CO.

### (Circuit Court of Appeals, Sixth Circuit. February 5, 1895.)

### No. 253.

1. FEDERAL COURTS—JURISDICTION—AMOUNT IN CONTROVERSY.
   A bill, seeking a mandatory injunction to compel a defendant railway company to give complainant equal facilities with others for receiving and shipping cattle, alleged that the damage done by the refusal of such equal facilities was irreparable, and largely exceeded $2,000. *Held* that, in the absence of a plea to the jurisdiction, this allegation was sufficient, though denied by the answer, and not sustained by any proof.

2. EQUITY—PRACTICE—TENDER BEFORE SUIT.
   It seems that, where such a bill contains a tender of the expense of providing the facilities sought, and the answer denied the right of the complainant to such facilities on any terms, the objection that there was no demand for such facilities or tender of the cost, before suit, is one that might be obviated by a provision as to costs, and is not a ground on which the court should rest its decision.

3. SAME—ENGAGING IN SUPERVISION OF BUSINESS.
   The rule that a court of equity will not make an order requiring it to supervise the details of business transactions is one the application of which rests very largely in the sound, legal discretion of the court; but it will not prevent the court, in a proper case, from requiring a defendant to furnish facilities for the loading and unloading of live stock. Stock-Yards Co. v. Keith, 11 Sup. Ct. 461, 139 U. S. 136, followed.

4. GRANT UPON CONDITION—BY WHOM ENFORCED.
   Where land has been granted to a city for the purpose of a public landing, and such city gives a license for a railroad to construct a track over such land to receive and deliver freight, the railroad cannot, while no objection is made by the grantor of the land, use the terms of the grant as an excuse for failing to construct and use such track, when required to do so.

5. RAILROADS—UNJUST DISCRIMINATION.
   Where a complainant seeks to compel a railroad company to afford it facilities equal to those given to a favored rival, it is no defense that the railroad company has the right at any time to withdraw the facilities furnished to the favored person.

6. SAME.
   The L. R. R. Co. constructed a spur track in a city street, over which it received and delivered freight from and to persons owning land abutting on the street, and engaged in business there. The freight so received and delivered was all of the class known as "dead freight," and could all be handled at the convenience of the railroad company. The grade and curve at the point where the spur left the main track were such that only three loaded cars could be drawn up at a time. The B. Co., which was engaged in shipping and receiving live stock, requested the L. R. R. Co. to construct a siding from the spur track to its stock yards for the purpose of receiving and delivering cars of live stock. The B. Co.'s yards were at a distance of 40 feet from the street on which the spur track was laid. It would be necessary for the railroad company to receive and deliver cars of live stock without delay at any time to meet its convenience in handling the cars, and to employ extra men in order to care for the traffic. *Held*, that the difference in the business of the B. Co. and that of the abutters upon the spur track was so great that a refusal by the railroad company to afford equal facilities to the B. Co. did not constitute unjust discrimination.

7. SAME.
   The L. R. R. Co. made a contract with the U. Stock-Yards Co. by which it agreed to make the U. Stock-Yards its sole stock depot in the city of

N., and to deliver there all stock consigned to persons in said city. No charge was made, in addition to the usual transportation charges, for loading or unloading stock at the U. Yards, but, if live stock unloaded there was not removed by the consignee within two or three hours, a charge was made for keeping it. The B. Co., having a stock yard in the city of N., demanded that the L. R. R. Co. furnish it facilities for receiving and shipping stock at such yards. *Held,* that so long as the railroad company furnished a sufficient depot, either of its own or under contract with another company, for receiving and shipping stock, without extra charge, it was not unjust discrimination to refuse to furnish similar facilities to the B. Co. at its yards. Stock-Yards Co. v. Keith, 11 Sup. Ct. 461, 139 U. S. 128, distinguished.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

This was a suit by the Butchers' & Drovers' Stock-Yards Company against the Louisville & Nashville Railroad Company, to compel it to build a spur track connecting with complainant's yards. The circuit court dismissed the bill. Complainant appeals.

This is an action in equity by a stock-yards company for a mandatory injunction to compel a railroad company to build, or to allow to be built, a side track connecting a spur track of the railroad company with the stock yards of the complainant, and there to deliver and receive all cattle consigned to and shipped by the complainant. The defendant answered, and the cause was heard on pleadings and evidence, and resulted in a dismissal of the bill. The complainant appeals. The facts are substantially as follows: The complainant, the Butchers' & Drovers' Stock-Yards Company, was organized under the laws of Tennessee, and entered upon its business in 1889. It has a stock yard within the city limits of the city of Nashville, and near to the business center thereof. The Louisville & Nashville Railroad Company is a corporation of Kentucky, whose line of railroad extends to and through Nashville from Louisville. In 1890 the city council of the city of Nashville passed an ordinance permitting the defendant company to lay a spur track from its main track along Front street in said city. The ordinance contained a provision requiring defendant to furnish persons, whose warehouses abutted on Front street, just and equal facilities for shipping and receiving freight in car-load lots. The defendant company, because of this provision, declined to accept the privileges conferred by the ordinance. Thereupon another ordinance was passed, granting the defendant the right to lay down in Front street a single track from its main track on Market street, with all necessary switches and turnouts. It provided that no part of said spur track should at any time be used by the railroad company, its patrons or others, as a storage place for loaded or empty cars, and that it should only be used for promptly delivering and receiving freight along the line thereof; and the switching of cars not directly connected with or used for this purpose was expressly prohibited. It was further provided that the defendant company should transfer freight received from other roads to parties on the spur track upon payment of an amount not exceeding 1 cent per 100 pounds in car-load lots. W. G. Bush and others, engaged in the manufacturing business along Front street, in order to induce the railroad company to lay the track permitted in the ordinance, entered into a contract with the railroad company by which they agreed to pay not exceeding $6,000 to defray the expenses of laying the spur track, which was about one mile in length. Sidings were laid by the defendant from the spur track to the property of W. G. Bush & Co., Jacob Shaffer, Levi Langham, and the Capitol Electric Company, and others, under contracts made by the railroad company with these parties, in each of which the defendant retained the right to disconnect the siding from the spur track at any time without notice to the other party. The persons or firms with whom these contracts were made were manufacturing firms or coal dealers. They all owned land abutting on Front street. Complainant is engaged in receiving, feeding, weighing, selling, and shipping live stock for the general public. Its yards

**are a** block away from the defendant's main line. They do not abut immediately on Front street. Between them and that street there is a strip of land 40 feet wide, belonging to the city, which was granted to the city to be used as a public landing, under the direction and control of its mayor and aldermen, and to be held to the only proper use and benefit and behoof of said mayor, aldermen, and their successors in office, forever. At the time of making the demand hereinafter stated, neither the complainant nor the defendant had any right to construct a siding upon this 40-foot strip. After the demand was made, however, on October 3, 1892, and before the filing of the bill, the council of the city of Nashville gave a license to complainant to construct a side track to Front street across this strip. In 1891, after the spur track and the sidings already alluded to had been constructed, the complainant requested the defendant that a siding be so constructed in front of complainant's property as to allow the transportation of live stock to and from its establishment in car-load lots, and that the same facilities for transportation be afforded to it as were enjoyed by Bush & Co. and the others who then had sidings. One of the vice presidents of the defendant gave complainant reason to believe that the request would be acted upon favorably, but subsequently wrote that he had no authority whatever in the matter. In February, 1892, complainant requested from the defendant a statement of the conditions upon which defendant would consent to the construction of the switch. In March following, the complainant made a contract with Bush & Co., in which it was agreed that, if the complainant would pay Bush & Co. a ratable share of the original cost for constructing the same, the complainant might use the spur track. Shortly after, defendant's attorney answered complainant's request, and stated that, inasmuch as the siding proposed appeared to be desired solely for the purpose of receiving and delivering live stock at defendant's yards, and the railroad company had provided a station for this purpose at Nashville, the establishment of another was declined.

The stock-yards station referred to was that of the Union Stock-Yards Company. In 1880, the Louisville & Nashville Railroad Company, the Nashville, Chattanooga & St. Louis Railroad Company, and the Union Stock-Yards Company had entered into the following contract: "This article of agreement, made and entered into this twenty-fifth day of March, one thousand eight hundred and eighty, between the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway Company, [for the establishment of] a first-class stock yard, including chutes of sufficient capacity and suitable accommodations for the carrying out of the contract: said stock yards always to be kept properly equipped with suitable fencing, feeding means, shelter, and other conveniences usual and customary in the best class of stock yards in the country for the proper management of said stock yard. The party of the second part further agrees to keep at hand a sufficient number of skilled workmen to perform the operation herein agreed to be done by said party of the second part, and generally to do such work and labor as is usually provided by the managers of stock yards of the best class, and especially that they shall be skilled and well qualified to load and unload any and all live stock which may be received or delivered by said parties of the first part to said stock yards to be loaded or unloaded. And said party of the second part further agrees and promises to load and unload and take proper care of all live stock, at risk of damage of said party of the second part, that may require such loading or unloading on or from cars at said stock yards, and to charge therefor no more than is charged for similar services at the time when rendered by the operators of other stock yards in neighboring cities, or no more than may be agreed on hereafter between the parties to this contract, and in no event to charge more than sixty cents per car load for loading or unloading, and to make no charge for loading or unloading less than car loads. The party of the second part further agrees that all charges for keeping, feeding, or caring for live stock coming to said party of the second part under this contract, direct or indirect, shall be reasonable, and not greater than the charge for similar work, caring, feeding, etc., by other first-class stock yards in neighboring cities. And for all charges upon stock delivered by the said parties

of the first part to said party of the second part the party of the second part shall be responsible, and shall pay said charges promptly to the parties of the first part, in such manner and at such times as may be directed by the proper officers of the parties of the first part. In all matters relating to the shipment and delivery of stock at said yard, unless exception shall be made hereafter, the party of the second part is to act as agent of the shipper or consignee, respectively, and to answer for and be responsible to, him for the proper conduct and management of the shipment of the same, it being distinctly understood that the liability of the parties of the first part shall cease upon the delivery of the cars containing the live stock as hereinafter specified, and shall not commence until cars are properly loaded, and that in loading and unloading said stock to and from the cars of the parties of the first part the party of the second part is acting as agent of the shippers or consignees. It is further agreed by the party of the second part that the management of the stock yard shall always be entirely acceptable to the management of the parties of the first part. The parties of the first part agree to pay to the party of the second part the sum of sixty cents per car load as above for each car load of stock loaded or unloaded at said yard, from or for the roads of the parties of the first part. And they further agree to maintain and keep in good order and repair the necessary tracks, switches, sidings, and all other necessary means for loading and unloading, and other suitable and proper conveniences and appurtenances usually and customarily furnished by railroads to stock yards. And the parties of the first part further agree that they will not lease or rent any of their grounds in the city of Nashville for the establishment of a stock yard or other stock yards in the city of Nashville, and that they will establish no other stock depot in the said city of Nashville, and that they will deliver and cause to be delivered to said party of the second part all the live stock shipped over the roads of the parties of the first part, and consigned to the city of Nashville; and, further, that, should stock be shipped to any other party or parties in the city of Nashville, the parties of the first part hereby agree to make this stock yard of the party of the second part their stock depot for said city, and will not deliver at any other point or points of the city, and agree to deliver all live stock shipped to said city of Nashville at the yards of the party of the second part; and, furthermore, that they will give to the party of the second part the right and privilege to bed all cars for live stock which they may desire to have bedded, or of the bedding of which they may have control. It is mutually agreed between the parties to this agreement that the delivery of stock upon switches or sidings provided for this purpose shall be deemed a delivery to the party of the second part, and thenceforward said party of the second part will be responsible therefor to the owner or consignee or shipper. This contract shall be binding and in full force for the space of ten years from this date."

The contract was continued in force, and the parties were still acting under it at the time of this controversy. The stock yards referred to in the agreement were without the city limits of the city of Nashville, and about a mile and a half from the stock yards of the complainant. The evidence in the record, some of which was admitted and some of which was excluded by the court below, shows that no charge beyond the ordinary charge for transportation is made for the loading and unloading of cattle at the stock yards to the shipper or consignee; that after the cattle have been unloaded, and have not been taken away by the consignee from the yard for two or three hours, they are then turned into the pens of the stock yards, where a charge of two dollars per car for a day or part of a day is made by the stock-yards company for keeping them, until the consignee takes them away. When cattle arrive at night, the usual result is that they are turned into the pens, because the consignee cannot drive them through the streets at night. There was evidence also of a charge of five or ten cents per head by the stock-yards company if, after the cattle have been priced in the Union Yards, they are removed without sale to another stock yard.

The Front street spur track leaves the defendant's main track between Market and Front, and the curve from the main track in to Front street is so sharp and the grade is so steep that, with the engines used by the de-

fendant, but three loaded cars can be drawn up at a time. If live stock freight were to be carried over the spur track, the defendant would be compelled to employ extra shipping crews to care properly for the same, because of the frequent trips required, and the freight would have to be handled at night on the spur track, while at present it is only handled in the daytime. The class of freight which complainant proposes to ship and receive consists of live stock, while the freight of Bush and all the others along the spur track is lumber, logs, coal, and brick, and what is known as "dead freight." The latter can be handled to suit the defendant's convenience. It may be received and taken away at such times as are convenient to the defendant. Delays of a few hours cause neither loss nor trouble. Live stock, because of its perishable nature, cannot be loaded on the cars until the train is about to leave, and then the cars must be removed at once. The exigencies for the carriage of live stock are imperative. It cannot be delayed without danger of loss to the shipper or consignee; and, for shipment to other states, it is subject to the regulation of the federal statute imposing a penalty for confining the stock in cars without unloading for rest, food, and water every 28 hours. Rev. St. §§ 4386–4388. Complainant's stock which is to be shipped or received by rail from Nashville, over the defendant's line, must be driven through the streets of Nashville a mile and a half, between the yards of the complainant and the Union Stock Yards. The complainant did not tender the cost of the construction of the siding to the defendant before the filing of the bill, but it makes a formal tender in the bill.

The bill charges, concerning the Union Stock Yards, as follows: "That there is a stock yard known as the 'Union Stock Yard,' outside the city limits, and on the line of the Nashville, Chattanooga & St. Louis Railway, and which was established by the defendant; and, while it is a stock company, it is in the hands of and under the control of the defendant, and is operated by it, its agents or stockholders, and is conducted in the interests of the defendant. That, in having control of the Union Stock Yard, it discriminates against the complainant, the Butchers' & Drovers' Stock-Yards Company, by charging it a fee amounting to about six dollars on the car load of stock, for stock transferred from the Union Stock Yard (and which means driven out of the Union Stock Yards for the Butchers' & Drovers' Stock-Yards), which is not charged when driven out and shipped on the defendant's railroad. That, while this is a charge made by the Union Stock-Yard Company, it is done at the instance and for the benefit of the defendant, and is intended to cripple the complainant, the Butchers' & Drovers' Stock-Yards Company. That said defendant has no stock yards or station for removing and shipping stock on the line of its road in or about Nashville, nor is there any such yard kept by others on the line of said road, in or about Nashville." The averment as to the jurisdictional amount in the bill is as follows: "The complainant corporation further states, as hereinbefore stated, that the transportation of live stock over said spur track, to and from its establishment, is essential and necessary to the profitable management of its business; that the injury and damage done to its business by the refusal of said railroad company to afford to it such transportation and shipping facilities is irreparable, and largely exceeds the amount of the sum of $2,000; and that the complainant, the Butchers' & Drovers' Stock-Yards Company, is entitled to have the defendant railroad company restrained and enjoined from making such discrimination in transportation against complainant, and, further, to have said railroad company restrained and enjoined from refusing to afford to the complainant corporation full and equal transportation over said spur track, as said defendant railroad company is bound to do, by its construction and operation of said spur track, under said acceptance and as a common carrier." The answer is quite full, but it is sufficient, for the purpose of the case, to say that it denies the charge of discrimination against the complainant; avers that the Union Stock Yards, which it has the right to reach over the tracks of the Nashville & Chattanooga Railroad Company, furnish ample facilities as a station for the delivery and receipt of live stock; denies that the railroad controls the stock-yards company; and denies that it has done anything to

cripple complainant. It also denies that the damage suffered by complainant from defendant's refusal to furnish a siding exceeds $2,000.

A. S. Colyar, for appellant.

J. M. Dickinson, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The appellee seeks to sustain the dismissal of the bill on certain preliminary grounds, which must first be considered. It is contended that the jurisdictional amount in controversy is not sufficiently alleged in the bill, and, even if alleged, that it is denied by the answer, and no proof offered to sustain it. The amount in controversy in the action is the value of complainant's alleged right to have a siding built, and to have live stock in car-load lots received and delivered by the railroad company at its stock yards. The averment of the bill is that the injury and damage done to its business by the refusal of the railroad company to afford to it such transportation and shipping facilities is irreparable, and largely exceeds the amount of the sum of $2,000. The damage done by the refusal is to be estimated by the value of the right denied, and therefore the allegation that the damage largely exceeds $2,000 is inferentially a statement that the value of the right denied is largely in excess of $2,000. Even if this averment refers, as claimed by counsel, to damages sustained by complainant before the filing of the bill, it gives rise to the necessary implication that the subsequent permanent injury, unless enjoined, will exceed in pecuniary amount that already suffered, because the past damages only covered a period between the demand and the filing of the bill. We think a liberal construction of the bill must be given to sustain the jurisdiction of the court at this time, in view of the fact that no plea to the jurisdiction was made below, and no question of the jurisdiction seems there to have been raised. But it is said that the averment to the jurisdictional amount is denied by the answer, and is not sustained by any proof. It was decided in Wickliffe v. Owings, 17 How. 47, that where a bill in chancery avers that the defendant is a citizen of another state, this averment can only be impugned in a special plea to the jurisdiction of the court, and that the answer is not a proper place for it, under the thirty-third equity rule governing the practice in the federal courts. By pleading to the merits, the defendant admits the averments in the bill which state facts sufficient to establish the jurisdiction of the court. Sheppard v. Graves, 14 How. 505; De Sobry v. Nicholson, 3 Wall. 420. The objection to the jurisdiction of the circuit court, therefore, is not sustained.

The second objection is that the suit is prematurely brought, because there was no offer to pay the cost of building the side track before the filing of the bill, and there was no demand for the building of the side track after complainant had obtained license from

the city to build across the 40-foot strip and before the filing of the bill. As the cost of the siding is tendered in the bill, as the answer denies the right of complainant, by tender or otherwise, to have the siding, and as, in any decree which might be rendered against the defendant, payment by the complainant of the necessary amount could be made a condition precedent to any relief, we think this is rather a technical objection, which could be obviated by a provision as to costs, and is one upon which we would not place our decision.

Next, it is said that the court of equity will not attempt to enforce the remedy here sought, because it will involve a continuous supervision by the court of transactions between the complainant and the defendant, which would tax the court with the details of superintendence beyond anything a court of equity will undertake; and a number of cases are cited to the point. We think the objection cannot be sustained. The rule relied upon by the defendant is one which it is very difficult accurately to state. No clear line has been drawn between cases where a court of equity will act and will decline to act. The conclusion depends very largely upon a sound, legal discretion of the court exercised with reference to the peculiar circumstances of each application for its aid. It is sufficient for the purposes of this case to say that in Stock-Yards Co. v. Keith, 139 U. S. 136, 11 Sup. Ct. 461, the supreme court sustained an order of the circuit court by which a railroad company was required either to furnish facilities for the unloading or loading of live stock without charge at the stock yards where it was then receiving and discharging live stock, or to permit the complainant in that case to erect on the railway line chutes and yards for the proper loading and unloading of cattle under reasonable regulations of the railroad company. If such an order might be made and enforced by a court of equity, we know no reason why the relief here prayed for, if the complainant is entitled to it on the principles of equity, may not also be granted.

Next, it is objected that the court will not compel the defendant to be a trespasser, and that it would be a trespasser if it laid a track across the 40-foot strip which separates complainant's land from Front street. The contention is that the license granted by the city to the complainant to lay such a track was beyond the power of the city, because the 40-foot strip was limited in its use by the grant to public landing purposes. Until this objection is made by the grantor, and while those in possession and enjoyment of this strip permit the occupation contemplated, we do not think that the defendant can use the terms of the grant as any excuse for refusing to discharge a plain duty. It is very questionable whether the use of the strip for shipping purposes by side tracks is such a departure from the use enjoined as to be the subject of complaint by the grantor, and certainly, until he attempts to enforce a forfeiture, it does not lie with the railroad company to raise the objection.

Next, it is insisted that the court will not establish a right that may be dissolved at the will of the defendant. The railroad company

reserves the right in its contract with Bush to take up the spur track at any time, and therefore it is said that it cannot be compelled to do that for the complainant which it might at once cease to do by taking up the track. This objection is untenable. The gravamen of the charge in the bill is that the railroad company is discriminating against the complainant, and in favor of those to whom sidings from the spur track are permitted, and that it should be granted equal facilities with such persons. The prayer is in form for an injunction against the discrimination. If the spur track is taken up, then all who enjoy it will be placed on an equal footing and at an equal disadvantage. But complainant's claim is that, while others enjoy the spur track, it also should have the same facilities. It is clearly no defense to a charge of discrimination that the facilities furnished the favored person may be with-drawn at the will of the one who grants them.

We are therefore brought to the issue whether or not there is any discrimination between those who have side-track connections on Front street and the complainant. This depends on two questions: First. Is it a discrimination which can be controlled or restrained by the courts for a railroad company to furnish a side track to one of its customers, and to refuse such accommodation to another similarly situated? Second. Conceding an affirmative answer to the first question, is there such a difference between the facilities demanded by the complainant and those extended to its neighbors on Front street, in respect of the comparative burdens which must be assumed by the railway company in granting them, as to justify the latter in making the distinction it insists upon?

The first question is one full of difficulty, both at common law, upon the principles of which this case must be decided, and also under the interstate commerce act. Because we are able to satisfactorily dispose of the case on the second question, we reserve consideration of the first until the case arises which requires it. We are clearly of opinion that, however unjust and unlawful it may be for a railroad company having furnished a side track to one shipper to refuse it to another similarly situated, the difference in this case between the business of the complainant and that of the other abutters upon the spur track is so great as to make the refusal of the railroad company to grant the side track to the complainant entirely reasonable. The difference between the duties of a common carrier in the transportation of live stock and of dead freight has been remarked upon more than once by the supreme court of the United States. North Pennsylvania R. Co. v. Commercial Nat. Bank, 123 U. S. 727–734, 8 Sup. Ct. 266; Stock-Yards Co. v. Keith, 139 U. S. 128–133, 11 Sup. Ct. 461. The evidence clearly shows that the delivery of car-load lots of dead freight and the receipt of them by side tracks is much less onerous, and involves much less care and responsibility for the railroad company, than would the receipt of live stock from a private yard by side track. One of the chief reasons why deliveries and shipments of railroad car-load lots by side track are possible and consistent with the conduct of the business of a large trunk line is that the loaded car may stand upon

a side track for hours, or even a day, until the railroad company finds it convenient to back its engine down and take it. Such delays are utterly impossible in the proper transportation of car loads of live stock. When they are loaded, they must be moved. The evidence shows that in other respects the supervision of the switching of cattle cars would be much more expensive and troublesome to the railway company than dead freight. Indeed, it hardly needs expert evidence to establish it. There is no ground, therefore, for any charge of unjust discrimination against the defendant railway company as between complainant and the Front street shippers.

We come now to the charge of discrimination as between the Butchers' & Drovers' Stock-Yards Company and the Union Stock-Yards Company. In the case of Stock-Yards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 461, the proprietors of a live-stock yard filed a petition in a railroad foreclosure suit in which a receiver had been appointed, who was operating the railroad under an order of the court, to compel the receiver to permit the erection of cattle chutes and yards along the line of the road for the receipt and delivery of the live stock of the petitioner. It appeared that all the live stock shipped on the railroad was delivered by the receiver through the stock yards of an incorporated company, at a short distance from petitioner's yards, under a contract made by the railway company with the stock-yards company, and that the latter charged the petitioner and other shippers and consignees a yardage fee for all stock loaded and unloaded by the railroad company. The circuit court held that it was the duty of the railroad company, as a carrier of live stock, to provide reasonable facilities for the loading and unloading of stock transported by it; that such facilities necessarily included chutes and yards, where the cattle might be kept until called for by the owner; and that it could not, in addition to the customary and legitimate charges for transportation, itself make, or allow any agent it employed to make, a special charge for merely receiving and merely delivering such stock in and through yards provided for that purpose. The circuit court, therefore, made the order, already referred to, by which the receiver operating the railroad was required either to file in court the written consent of the stock-yards company that the cattle shipped on the railroad might be delivered and received through its yards without a yardage charge, or that the receiver should permit the petitioner to erect chutes and yards adjacent to the line of the railroad for the convenient delivery and receipt of cattle under such reasonable regulations as the receiver or the succeeding railroad company might impose. This order was affirmed by the supreme court, and the ruling was explained by Mr. Justice Harlan, who delivered the opinion for the supreme court, in the following language:

"We must not be understood as holding that the railroad company in this case was under any legal obligation to furnish, or cause to be furnished, suitable and convenient appliances for receiving and delivering live stock at every point on its line in the city of Covington where persons engaged in buying, selling, or shipping live stock chose to establish stock yards. In respect to the mere loading and unloading of live stock, it is only required by the nature of its employment to furnish such facilities as are reasonably suf-

ficient for the business at that city. So far as the record discloses, the yards maintained by the appellants are, for the purposes just stated, equal to all the needs, at that city, of shippers and consignees of live stock; and, if the appellee had been permitted to use them without extra charge for more 'yardage,' they would have been without just ground of complaint in that regard, for it did not concern them whether the railroad company itself maintained stock yards, or employed another company or corporation to supply the facilities for receiving and delivering live stock it was under obligation to the public to furnish. But as the appellant did not accord to appellees the privileges they were entitled to from its principal, the carrier, and as the carrier did not offer to establish a stock yard of its own for shippers and consignees, the court below did not err in requiring the railroad company and the receiver to receive and deliver live stock from and to the appellees at their own stock yards in the immediate vicinity of appellant's yards, when the former were put in proper condition to be used for that purpose, under such reasonable regulations as the railroad company might establish. It was not within the power of the railroad company, by such an agreement as that of November 19, 1881, or by agreement in any form, to burden the appellees with charges for services it was bound to render without any other compensation than the customary charges for transportation."

In view of the principles laid down in this case, the complainant has no ground for objection to the arrangement between the Union Stock-Yards Company and the Louisville & Nashville Railroad Company. The latter uses the chutes and yards of the Union Stock-Yards Company to deliver and receive cattle at that point as its station without any yardage charge or fee for the proper loading and unloading of cattle. The evidence wholly fails to support the charge of the bill that the facilities afforded by the Union Stock Yards are not ample for the business of Nashville. The evidence establishes that no charge is made by the Union Stock-Yards Company for two hours after the cattle are delivered from the cars. There is no evidence to show that it would be unreasonable in the railroad company, were it the owner of the stock yards, to impose a charge for delay of the consignee in taking his cattle beyond two hours after unloading; and, in the absence of such showing, we cannot say that it is unreasonable for the railroad company to permit its agent, the stock-yards company, to make a charge of two dollars per car for turning the cattle into the pens and keeping them there after such a delay. The discrimination averred and sought to be proven by evidence that, after the cattle have been priced in the pen, they cannot be taken to another yard without paying a fee, concerns the business of the stock-yards company, and not that of the railroad company, whose responsibility ends after the cattle are properly delivered or tendered to the consignee. Of course, the railroad company in delivering the cattle to the stock-yards company, to keep until the appearance of the consignee, can incur only a reasonable charge for the keeping of the cattle. More than this, the consignee is not obliged to pay the stock-yards company. If, however, he thereafter chooses to deal with the stock yards company as a factor or sales agent, and to put a price upon his cattle for sale, the charges then imposed by the regulations of the stock-yards company, in case of a withdrawal of the cattle to another stock yard for sale, are wholly outside the question of discrimination by the railroad company as a common carrier. The contract between the defendants and the Union Company requires

rates charged by the latter to be reasonable. There is no attempt in the record to show that the charge for the simple keep of the cattle in the pens is unreasonable or any higher than the railway company itself might charge for such service.

The decree of the court below is affirmed, with costs.