### CROWN CORK & SEAL CO. v. STANDARD BREWERY.

### SAME v. GREENBERGER.

(Circuit Court, N. D. Illinois, E. D. December 16, 1909.)

Nos. 28,804–28,807.

1. COURTS (§ 322*)—JURISDICTION OF FEDERAL COURTS—PLEADINGS.
   In a suit in equity in a federal court, an allegation of complainant's citizenship in the bill, though denied in the answer, stands admitted, unless a plea to the jurisdiction is filed.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. § 882; Dec. Dig. § 322.*]

2. PATENTS (§ 256*)—LICENSES—RESTRICTION ON USE OF PATENTED ARTICLE—INFRINGEMENT.
   A contract by the user of a patented machine, under which he obtained such machine from the owner of the patent, that it shall be used only in connection with an article also made and sold by such owner, is valid and binding upon such user. even though he buys and pays for the machine and is vested with the legal title thereto, and its use by him in violation of the restriction imposed by such contract is an infringement of the patent.
   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 256.*]

3. PATENTS (§ 259*)—INFRINGEMENT—CONTRIBUTORY INFRINGEMENT.
   The furnishing to the user of a patented machine, under a license binding it to use such machine only with an article purchased from the owner of the patent, of similar articles made in imitation of those of the patentee, and adapted for use and used only on such machines, constitutes contributory infringement.
   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 259.*
   Contributory infringement of patents, see notes to Edison Electric L. Co. v. Peninsular Light, P. & H. Co., 43 C. C. A. 485; Aeolian Co. v. Harry H. Juelg Co., 86 C. C. A. 206.]

4. PATENTS (§ 328*)—INVENTION—BOTTLE STOPPING DEVICE.
   The Painter patent, No. 468,258, for a bottle sealing device. was not anticipated, and covers a patentable combination; also *held* infringed.
   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suits by the Crown Cork & Seal Company against the Standard Brewery and Max Greenberger, respectively. Decrees for complainant in each case.

Edwin G. Baetjer, James Q. Rice, and Robert H. Parkinson, for complainant.

William O. Belt (S. L. Moody and Louis C. Raegener, of counsel), for defendants.

SANBORN, District Judge. These are four suits for infringement, commenced in September, 1907, of patents 468,258, February, 2, 1892, for the crown cork or seal bottle sealing device in common use, and three patents on machines for putting on the crown cork, Nos. 473,776, April 26, 1892, 638,354, December 5, 1899, and 643,973, February 20, 1900. Complainant alleges that the Standard Brewery is its licensee of machines covered by the three machine patents, and the only infringement charged is the use of infringing corks, not made by com-

plainant, but by defendant Greenberger and others, in violation of licenses taken by it. As to Greenberger, he is charged with infringement of the crown cork, and a decree for injunction, damages, and profits is demanded against him; and he is also charged with contributory infringement of the machine patents by furnishing infringing corks to the Standard Brewery, and a like decree demanded. As to the Standard Brewery, it is charged with infringing the crown cork patent by the use and sale of infringing corks, and it is also charged with a violation of its license by the same use and sale. In the machine patent cases the Standard Brewery is charged with infringement by the use of the machines in connection with infringing crowns, and Greenberger is charged with contributory infringement of the machine patents by causing to be used thereon infringing crowns, adapted to no other use, and by furnishing such crowns to complainant's licensees of machines, who were restricted by their licenses to the use of complainant's crowns, thus procuring the application of the crowns for purposes not authorized by the licenses; that the only market for the infringing crowns is among complainant's licensees of the machines, there being no other apparatus on the market or in use, practically adapted to the use of the crowns; and that this condition is well known to Greenberger, who furnished the crowns without any distinguishing marks, purposely to cause them to be confounded with complainant's crowns.

It will be seen that the suits are brought, not only in the exclusive federal jurisdiction for the infringement of the patents, but also in the concurrent state and federal jurisdiction for the breach of the alleged licenses; but diverse citizenship and a sufficient sum in controversy are alleged in each case. Complainant is alleged to be a Maryland corporation, and a citizen of that state, and defendants citizens of Illinois, and residents of the district where suit was brought, and the matter in dispute is averred to be $50,000 in each case. The citizenship of defendants and amount in dispute are admitted by failure to deny, but the answers deny the citizenship of complainant. However, there was no plea to the jurisdiction, so that in equity it stands admitted, whatever the rule may be at law. Butchers' & Drovers' Stockyards Co. v. Louisville & Nashville R. Co., 67 Fed. 35, 14 C. C. A. 290, 31 U. S. App. 252; Roberts v. Lewis, 144 U. S. 653, 12 Sup. Ct. 781, 36 L. Ed. 579. Complainant, therefore, may have relief in both aspects of the case, if otherwise entitled to it.

The case is thus stated by counsel for complainant:

"The bills show, and the proofs establish, that complainant has, from prior to the date of each of the several patents, been the sole owner of the inventions secured thereby, as assignee of the applications therefor and all rights to be secured thereunder; that prior to the issue of the first-mentioned patent it established a plant for manufacturing machines embodying the invention of such patent, and for manufacturing sealing devices adapted to use therewith, and ever since has carried on such manufacture on an extensive scale, including the invention of each of the subsequent above-mentioned patents from about the issue thereof, supplying such machines and the patented sealing devices adapted to use therewith throughout the United States in very large and constantly increasing quantities; that it is and has been prepared to supply the entire market therefor throughout the United States; that it has uniformly, throughout the terms of these patents, retained to itself the exclusive

right to manufacture and supply these inventions, and has supplied these patented machines uniformly under a license authorizing their use only for the purpose of applying sealing devices furnished by it, the licensee in all cases stipulating, as a condition of obtaining such machine, to use it for such purpose only; that these patented machines, thus licensed, have been put into very extensive use throughout this country, and are the only means in practical use, or upon the market, for applying sealing devices of the character referred to; that the validity of these patents has been acquiesced in, and complainant's rights thereunder respected, except for the recent infringements herein complained of, and some others of like character, also of recent date; that the defendant the Standard Brewery is a licensee of complainant under the patents in suit, its license expressly limiting its rights thereunder to the use of these machines in applying sealing devices obtained from complainant; that this defendant obtained and is now holding these patented machines subject to such license, wherein it expressly agreed, as a condition of being furnished with these machines, not to use them for any other purpose; that shortly before the suit was begun it procured, in violation of its license, from unauthorized persons, imitations of complainant's sealing devices, made in such exact counterfeit thereof as to be applied with these machines and to pass for complainant's; that, when complainant discovered that it was using these patented machines for purposes not authorized by the license, it promptly notified it, calling its attention to the restriction of the license, and requesting it to desist; that it refused so to do, and continued thereafter to procure from unauthorized persons sealing devices made in exact imitation of complainant's, and to use said patented machines in applying the same in violation of its license, setting complainant's rights under its patents at defiance, while retaining the possession and unlawful use of the patented machines; that the defendant Max Greenberger, carrying on business under the assumed name 'Spanish-American Cork Company,' is, with full knowledge of the premises, supplying imitation sealing devices to complainant's licensees holding its above-mentioned patented machines under the aforesaid restricted license, these sealing devices being exact counterfeits of complainant's, and being made and sold for the express purpose of, and with exact adaptation for, application to the complainant's above-mentioned patented machines licensed as aforesaid, being solely furnished to bottlers holding such patented machines under such licenses and using no other means of applying such seals; that the only market for such sealing devices is for the purpose of being applied to bottles by complainant's above-mentioned patented machines held under the above-mentioned restricted licenses; that they have been supplied and offered by this defendant for use on such licensed machines and so used with full knowledge of the fact that such machines were subject to this restricted license, and could not be used on sealing devices furnished by others than complainant, except in violation of the license under which they were held; that this defendant was fully advised by complainant, both by publications in trade journals and by special notices served upon him, of the fact that those to whom he was furnishing these imitation sealing devices were using them, and could only use them, in violation of their aforesaid licenses, that all machines in use for applying such sealing devices were covered by complainant's aforesaid patents, and licensed only for use with complainant's seals, and that by furnishing such seals to complainant's licensees he was contributing to and inducing the violation of said licenses and the infringement of said patents; that he was requested to abstain therefrom, but refused so to do, and has continued to supply such imitation sealing devices to complainant's licensees for use on complainant's patented machines held under said restricted licenses, intending that they should be so used, and well knowing that they were being and would be so used."

The system adopted and used by complainant is thus described by counsel for complainant:

"When complainant started, early in 1892, to introduce what it has called the 'Crown Cork System of Bottling,' a system which has completely revolutionized the art of bottling, it adopted at the outset the plan which it has uniformly pursued since of furnishing the patented machines for applying the

new sealing devices only upon condition that they be used solely upon sealing devices obtained from it. At the same time it agreed to furnish these sealing devices at a price not to exceed 35 cents a gross, which was afterwards reduced to 25 cents a gross. This made the cost of sealing a fraction of what it had been by inferior methods before. These machines, and sealing devices so formed that their corrugations and the seal inclosed in the crown, became active factors co-operating with the patented mechanism in effecting the closure, and were correlative elements in working out this new system of stoppering bottles. There had been so many unsuccessful schemes for replacing the long cork, and their failure had involved so much loss to bottlers who had experimented with them, that every new project of this kind was looked upon with distrust. Bottlers hesitated to invest largely in machinery, where such investment would be sunk if the system proved unsatisfactory or was used only to a limited extent. It was necessary to have special adaptation of sealing devices to the engaging mechanism of the machine, and of the machine to the sealing devices, and to have each throughout as perfectly as possible adapted to each other, in order to secure the best results. To safeguard itself and the public in these respects, and to apportion as far as possible the tribute it was to receive from the invention to the extent of use to which the invention was put, complainant adopted this license plan, by which the patented machines, instead of being sold outright, were furnished only to licensees, whose use of them was restricted by the terms of their license to the application of sealing devices furnished by complainant. As each sealing device represented a use of the machine for stoppering a bottle, this method of obtaining compensation for the franchise gave an exact registration of the extent to which the machine was actually used, and made the compensation proportionate to such use. Those who made but little use of the machine paid but little tribute. If the bottlers found it to their interest to use the machine extensively, the tribute paid increased proportionately. In any event it was a small fraction of the saving made by the use of the machine. This was in every respect the fairest method of securing revenue from the franchise, since the revenue paid was only a percentage of the saving actually made by the user of the franchise, stopped when the use stopped, and began again when the use was resumed. If the bottling establishment was idle, or if it dispensed with the use of these machines, it was relieved from tribute. If it was using the machines constantly, and getting continued benefit from the invention, it was paying for the franchise a small fraction of the saving effected by it.

"This also afforded some check upon secret infringement. Bottling is often done in out of the way places, where it can easily be concealed, and this sealing device can be made in cellars and garrets, and so delivered as to escape notice. It would therefore be easy to make and operate infringing machines without detection, and to supply them with counterfeits of complainant's caps, also made in concealment, without being detected, if it were not for the record complainant is thus able to keep of the authorized use of both machines and sealing devices. While it may be possible for licensees to occasionally work in with the genuine sealing devices some counterfeits without detection, and may be possible for a few counterfeit seals to be made in cellars and garrets, and furnished in small quantities to such licensees without exposure of those who furnish them, the fact that complainant has a record of the machines furnished and the number of sealing devices supplied to each licensee, and that the amount of bottling done by each licensee is approximately obtainable, makes it much more difficult for either infringer to long conceal the infringement. This is well illustrated in the present records, where each infringer owed detection to the double check thus furnished.

"It is shown without contradiction that, from the inception of its business in the early part of 1892, complainant has uniformly refused to sell the patented machines outright, or to authorize any one else to build or deal in them, or to use them, except upon condition that their use should be confined to sealing devices furnished by it; that it has in every possible way advised the trade of this fact, and uniformly adhered to this rule; that every person authorized to use a machine embracing the invention of either of the patents in suit has obtained that authority only through and in accordance with a license so limit-

ing its use, and upon the condition that the licensee expressly bound himself or itself to obtain all its sealing devices from complainant and to use the machine only for the application of sealing devices so obtained, complainant at the same time obligating itself not to charge beyond a stipulated price for such sealing devices; that the defendant the Standard Brewery obtained its machines, which it has been using for the infringing purposes, under such a license, and that the defendant Max Greenberger has been furnishing counterfeit sealing devices of other manufacture (whose manufacture he refuses to disclose) to complainant's licensees, adapted and intended for use on these licensed machines, with full knowledge that they were held under licenses which excluded their use for applying any sealing devices except those furnished by complainant."

The license contract issued by complainant to the Standard Brewery under its system is as follows:

"To one Automatic Crown Machine, $1,800. With license to use the same in Chicago, Ill., upon the conditions named herein. The conditions upon which this license is granted, and the machine furnished, are that Standard Brewing Company has agreed to operate the crown cork system, as covered by patents No. 468,226, 468,258, 468,259, dated February 2, 1892, No. 473,776, dated April 26, 1892. No. 638,354, dated December 5, 1899, and No. 643,973, dated February 20, 1900, and that the machine furnished by the company shall only be used in connection with crown corks made and sold by the Crown Cork & Seal Company, which the said company agrees to supply at a price not exceeding 25 cents per gross for plain crown corks. It is further agreed that no claims for consequential damages shall be allowed by the Crown Cork & Seal Company."

The defenses advanced by the Standard Brewery are that defendant is not a licensee, but that its machines bought from complainant are generally licensed by the fact of sale, and that the use of machines is limited only by collateral contract, and only in the case of its automatic machine; that the defense of the patent is open to the Standard Brewery, that the patent is invalid, and that the use of infringing crowns was enforced upon it by the conduct of complainant itself, so induced and procured by the complainant, and so justified by necessity and the equities of the case. The Standard Brewery further alleges that its machines were purchased outright, and that their use with crowns of other manufacture than complainant's was at most in violation of a contract between the parties, whose violation gave no right to procedure under the patent law, but at most gave the complainant the right to demand damages for its violation.

In the Crown Cork Case it is also alleged that the patent in suit expired February 2, 1909, before the proofs were closed, and that no injunction should therefore be granted against either of the defendants. It is admitted that the crowns are unquestionably substantial duplicates of those manufactured by complainant and completely embody the inventions of every claim in suit. The only defense, therefore, advanced by Greenberger, is the invalidity of the patent and claims sued upon. In the machine cases the defenses of the Standard Brewery are substantially the same as in the other cases above stated. Greenberger's defenses are that the machines were not licensed; that the crowns are a common article of merchandise, no more especially adapted for use on complainant's machines than others; that Greenberger is not shown to have any knowledge that his crowns were intended for use on complainant's machine, or knowledge of any license touching such

machines, if there be any such license; that Greenberger is not shown to have threatened or intended that his crowns were to be used in violation of any license; therefore that no accounting can be ordered as against him, and no cause for injunction is shown.

The last license so called, dated April 17, 1907, was applied for by Mr. Francis J. Dewes, president of the Standard Brewery, after trying to obtain a waiver of the restrictive features of the license, by signing a written application stating that defendant applies for a license to operate the crown cork system and crown machine, covered by the patents in suit, requesting the furnishing of a machine for $1,800, and stating that upon granting the license the system and machine should be used by the company only, in connection with crown corks purchased from complainant, at not to exceed 25 cents per gross. The bill above referred to, dated May 11, 1907, was thereupon sent, stating the same conditions as the application. It is true that the two earlier applications and bills were not signed by the president of the company, but by managers of the bottling department. However, the testimony clearly shows that the Standard Brewery well understood the complainant's system, and had on its files receipted bills expressly stating the terms on which only it was authorized to use the machines. After the license of 1907 was issued, signed by the president, and after his attention was called to the matter in the clearest possible way, he signed and verified the answer of the corporation, stating that it was not advised, except by the bill, whether complainant had sold, leased, or furnished the machines upon special conditions or restriction. The bill required an answer to each of its paragraphs, waiving verification, and was entitled to be met by a truthful answer. Mr. Dewes states on oath that he has read the answer, and knows its contents; so it can hardly be called "lawyer's bluff." It was open to defendant to state the fact that the machines were sold with conditions as to restricted use, but that such conditions were inconsistent with the sale of the machines, and ineffectual and void, thus admitting the facts, and leaving the law to be determined. In addition to this, the circumstances of the infringement show that defendant placed no reliance on its defense of no license. It had agreed not to use infringing corks, and the last machine was sold with this understanding; but nevertheless their use was continued. When called to his attention, Mr. Dewes gave assurance that it would stop; but further supplies of the infringing corks were soon after obtained and used. The infringing crowns so used were in exact imitation of the patented devices, without any distinguishing mark. Mr. Dewes states that he wanted to have the spurious crowns gradually worked in, while also using complainant's corks. It should be stated that it is claimed that this infringing use was because the defendant brewery could not obtain suitable corks from the complainant, and used the others in self-defense; but this would not justify infringement, nor did the brewery ever squarely take this position. It ordered a new machine, after using the crowns for many years under the same conditions, and then at once proceeded to use upon it the infringing crowns.

It is clear, therefore, that the Standard Brewery cannot fairly plead
174 F.—17

ignorance of the terms of the so-called licenses, however much it may desire to do so. But their legal effect is still to be determined. By the terms of the application the brewery asks for license to operate the machine, to be used in Chicago, and requests that a machine be forwarded at $1,800. It obligates itself that the system and machine shall only be used and operated by it in connection with the crown corks purchased from complainant. From these terms it is argued by counsel for defendants that the intention to pass the full legal title to the machine is clear, and this may be conceded without examination, so far as the power of transfer is concerned. A sale by the licensee would probably be good; but that is not the question. Merely because the legal title to the machine passed to the vendee or licensee, are the restrictive conditions as to use thereby avoided and made inoperative so long as the vendee retains the machine? Why should a result so opposite to the one contracted for be thus produced? Why cannot the conditions as to use be given effect, so long as the person who agreed to them, and obtained the machine on faith of them, is before the court? Infringement would not be a cause of forfeiture, it is true. The title would still remain in the Standard Brewery. But why should that circumstance excuse all infringement? The contract, it may be assumed, without decision, passes the full title, but restricts the actual user, so long as the Standard Brewery keeps and uses the machine, to the putting on of corks furnished by complainant. If this restricted use is within the power of the vendor and purchaser to agree on, then any other use is an infringement. The sale of books with a condition of resale only at a certain price, as in Bobbs-Merrill Co. v. Straus (C. C.) 139 Fed. 155, 147 Fed. 15, 77 C. C. A. 607, 15 L. R. A. (N. S.) 766, and 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086, is quite different, because the sole value of books to a bookseller is the power of resale. Here almost the sole value is in the use, and it is quite difficult to see why a restricted one may not be effectively bargained for.

"Restrictions in respect to methods or purposes of use * * * may properly accompany any sale of a patented article." Walker on Patents, § 301.

"Any conditions, not in their very nature illegal, * * * imposed by the patentee and agreed to by the licensee, for the right to manufacture, or use, or sell the article, will be upheld by the courts." Bement v. National Harrow Co., infra.

The clear tendency of recent cases is to permit any lawful restriction of use, and some even go so far as to seemingly allow unlawful use, if not clearly beyond the patent domain: Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 47 U. S. App. 146, 35 L. R. A. 728; Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; Cortelyou v. Lowe, 111 Fed. 1005, 49 C. C. A. 671; Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58; Brodrick Copygraph Co. v. Mayhew (C. C.) 131 Fed. 92; Rupp & Wittgenfeld Co. v. Elliott, 131 Fed. 730, 65 C. C. A. 544; Aeolian Co. v. Juelg Co., 155 Fed. 119, 86 C. C. A. 205; Crown Cork & Seal Company v. Brooklyn Bottle Stopper Company (C. C.) 172 Fed. 225; Crown Cork & Seal Company v. Standard Crown Cork Co., Cir. Ct. S. D. N. Y., May, 1908, and Same v. Central Bottling Co., Cir. Ct. S. D. N. Y., August, 1908,

cases in which no opinion was filed. And in several cases in this circuit the dominion of the patentee over the patented article has been pushed so far as to justify restrictions on sales in territory not effectively, but only theoretically, covered by the patent monopoly, or by methods which the patentee alone could not use, and which were made possible only by a combination of licensees. Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co., 154 Fed. 358, 83 C. C. A. 336; Indiana Mfg. Co. v. J. I. Case Threshing Machine Co., 154 Fed. 365, 83 C. C. A. 343; The Fair v. Dover Mfg. Co., 166 Fed. 117, 92 C. C. A. 43. It is true that the whole question is still regarded by the Supreme Court as an open one (Bobbs-Merrill Case); but it has often approved the Button-Fastener Case, and until the court adopts a contrary rule the one here indicated should be followed, especially as it is the settled law of this circuit. A. B. Dick Co. v. Milwaukee Office Specialty Co. (C. C.) 168 Fed. 930. The direct question was certified to the Supreme Court March 16, 1909, by the Circuit Court of Appeals of the Second Circuit, in A. B. Dick Co. v. Henry. See Crown Cork & Seal Co. v. Brooklyn Bottle Stopper Co. (C. C.) 172 Fed. 225. The Cotton Tie Case, 106 U. S. 89, 1 Sup. Ct. 52, 27 L. Ed. 79, which seems on first reading to fully support restricted licenses to use patented articles, has been held not to be an authority on that point. Bobbs-Merrill Co. v. Straus, supra, in the Supreme Court.

The legal effect of a transfer of a machine by the licensee, made to a purchaser with full notice of the restriction, is fully discussed in Crown Cork & Seal Co. v. Brooklyn Bottle Stopper Co., supra, and the restriction held binding on such a purchaser. If the crown cork patent is valid (to be presently considered), the Standard Brewery has no valid defense on any ground connected with the form of the license contracts.

As to contributory infringement by Greenberger, the case is equally clear. With full knowledge of the situation in respect to complainant's licensed machines, he furnished crowns exactly adapted to be used on them, so like the genuine article that experts cannot distinguish between them. He writes letters urging complainant's licensees to disregard their obligations under the license contracts, and he arranged in advance for the defense of the licensees if infringement suits were brought by complainant. The crowns themselves are adapted to no purpose but use on the patented machines, except as to a few machines which have in some way escaped from the patent monopoly. Infringement by him is clearly established by the proofs, and the record shows his liability in the machine patent cases, even if the crown patent were invalid, because he knowingly contributes to infringement of a patent by aiding a use beyond the limits of the license made by the patentee. See the cases in the Southern district of New York, where the crown patent is treated as invalid, cited supra.

As to the validity of the crown cork patent, the Standard Brewery cannot raise the question in any of the four cases because it is a licensee, and Greenberger can raise it only in case No. 28,807, brought against him directly upon the crown cork patent; the bill in that case making no charge of contributory infringement. This patent has been

litigated with varying success. In 1903 it was sustained by Judge Morris in a case brought by Baltimore Crown Cork & Seal Co. v. Imperial Bottle Cap & Machine Co. (C. C.) 123 Fed. 669. In the next case the patent was likewise sustained (Crown Cork & Seal Co. v. Standard Stopper Co. [C. C.] 136 Fed. 199, Townsend, C. J.), but the decree was reversed by a divided court in the Circuit Court of Appeals for the Second Circuit; Judges Wallace and Lacombe for reversal, and Judge Coxe dissenting (Standard Stopper Co. v. Crown Cork & Seal Co., 136 Fed. 841, 69 C. C. A. 200). Meanwhile the Imperial Bottle Cap Case was appealed, and the Circuit Court of Appeals for the Fourth Circuit, having before it Judge Wallace's opinion in the Standard Stopper Case, held unanimously, by Judges Goff, Pritchard, and Brawley, that the patent was valid. Crown Cork & Seal Co. v. Imperial Bottle Cap & Machine Co., 139 Fed. 312, 71 C. C. A. 442. Six judges have sustained all the claims before them, including Nos. 1 and 3 here in question, and two judges have held the first three claims invalid. All the judges who have passed on claims 4 and 5 here in question have sustained the patent as to those claims.

This brings the discussion down to the question of the validity of the first, third, fourth, and fifth claims of the Painter patent in the Greenberger suit on the crown patent only. The fourth claim follows:

"4. The combination, with a bottle having a head provided with an exterior annular shoulder, of a sealing disk and a metallic sealing cap which encircles the disk, and has its pendent flange corrugated substantially throughout its depth, and also having its inner corrugations bent to conform with or to the annular shoulder on the head of the bottle, substantially as described."

The other claims limit or broaden the fourth by specifying a metallic sealing cap, a sealing disk at the mouth of the bottle (excluding a plug), a flange corrugated in the bent portion, a continuous and unbroken pendent flange corrugated throughout its depth in lines parallel with the axis of the cap, a corrugated flange bent into locking contact with the shoulder, and a projected edge on the flange to engage a bottle opener. There is no claim to a combination of the capping machine with the crown cork, so as to bring any of these actions within the decision of Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 301, 29 Sup. Ct. 495, 53 L. Ed. 805.

The sealing cap, composed of a thin cork disk covered and surrounded with a metal cap corrugated at its bottom flange, used on pop and beer bottles, is so familiar as to require no further description. Its efficiency is sufficiently established by the fact that 2,500,000,000 of them were put out by complainant in 1907. At the hearing a view of the latest machine was had, in actual operation. Eighty-two sealing caps per minute were being applied.

The main conception of the Painter patent is the bending of the corrugated pendent flange into a firm locking contact with the bottle shoulder under heavy elastic vertical pressure, and also the practical possibility of doing this on each individual bottle of slightly varying size and shape of mouth and shoulder. An important feature requiring the inventive faculty was the conception that by applying vertical pressure, resulting in lateral or inward pressure, by a conical hood

(shown in the contemporaneous machine patent) to the outer corrugations the inner ones could be made to lock firmly and tightly under these varying shoulders, so as to form, when the lip of the bottle is by the same vertical pressure caused to be firmly embedded in the sealing disk, a gas—and water-tight seal cap. And this cap, being of hard metal, can be easily thrown off by the ordinary bottle opener pulling on the corrugated edge with the bottle top as a fulcrum. The practical features referred to cannot be found in the prior art. Corrugations are found to improve exterior appearance, like frills or tucks upon an article of dress, as in the Whittlesey patent. Numerous hooks, fingers, etc., for catching or springing under the shoulder of a can or bottle, may also be found, as in many of the fruit can and other patents, notably in those of Elizabeth Taylor, 325,877, September 8, 1885, Geo. P. Goulding, 406,832, July 9, 1889, and J. Bellerjeau, 76,149, March 31, 1863. But these devices tend to destroy any close locking contact, rather than to secure it.

Corrugations also appear in the Goulding device, in order to stiffen the hooks which hold the cork in place, while those in complainant's patent are for the opposite purpose of being bent out of place. In the French and English patents of 1877 and 1878, called the Berthoud-Gedge patents, there was a most ingenious and long-continued attempt to spin a sealing cap upon the bottle neck, so as to make a hermetical seal. This was accomplished, but the difficulty was to get it off. The most effective means apparently was to smash the bottle head. In direct proportion to the success of the spinning process was the failure of the opening process. Both the on and off processes were slow and laborious. This discovery never was, nor could be, in the same class as the Painter inventions, being as far apart as the daguerreotype and the moving picture. Something similar might be said of all the inventions of the prior art. It is difficult to compare them with the Painter process. They all accomplished mainly old results in a new way, and their various features are constantly reappearing in numerous forms of boxes, tins, cans, and packages. The French-English invention, showing by far the greatest inventive genius, was perhaps the greatest failure of all, in a practical way.

On the other hand, the Painter cap, in direct and almost unbelievable disproportion to its extreme simplicity, at once achieved wonderful success. It is a very small affair. Its constituents are quite inconspicuous. It often happens that an inventor fails to grasp the really important and far-reaching feature of his device or process, and becomes bewildered in matters of detail. An example of this is the Ewen subconstruction patent (General Subconstruction Co. v. Netcher, 174 Fed. 236), where the inventor just failed to seize, and consequently to claim, an enormously important principle of the method of safely digging deep basements in the skyscraper districts of large cities. Not so Painter. His is one of the most minute and carefully thought out specifications to be found. Nothing escaped him. Its very completeness prejudices it, and led Judge Wallace to criticise and condemn it as verbose, and as designed to pre-empt the whole earth. But the inventor was dealing with small, simple, and inconspic-

uous things, which he realized were to have far-reaching results. It was necessary to explain fully. No one can misunderstand what he is seeking to accomplish, for it is all set down with great elaboration and wealth of detail. Perhaps it might be improved on, as a model of English style; but it certainly has unity, mass, coherence, force, and clearness, with some over-elaboration. It is much safer for a patent solicitor to err on this side than the other.

All the claims are for a combination. "A combination is a union of elements which may be partly old and partly new, or wholly old or wholly new. But, whether new or old, the combination is a means— an invention—distinct from them. They, if new, may be inventions, and the proper subjects of patents, or they may be covered by claims in the same patent with the combination. * * * They are not identical with the combination. * * * Certainly one element is not the combination, nor, in any proper sense, can it be regarded as a substantive part of the invention represented by the combination, and it can make no difference whether the element was always free or becomes free by the expiration of a prior patent, foreign or domestic. In making a combination, an inventor has the whole field of mechanics to draw from." Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 301, 318, 29 Sup. Ct. 495, 500, 53 L. Ed. 805, 813.

The doctrine here announced has always been the law, but was disregarded in the opinion of Judge Wallace in Standard Stopper Co. v. Crown Cork & Seal Co., supra. Here was a new and enormously important result, produced by new and improved means. Old elements are combined to create a thing absolutely new and greatly successful. If the law requires the court to deny its patentability, few combinations could logically be saved. It should be sustained, in my view, without the slightest hesitation.

Complainant is entitled to a decree as prayed in each of the four cases.