MISSOURI, K. & T. RY. CO. OF TEXAS et al. v. EMPIRE EXPRESS CO.
(No. 117–2980.)

(Commission of Appeals of Texas, Section A. May 12, 1920.)

1. Carriers ⊛12(5)—Constitutional law ⊛70(1)—Court not authorized to fix rates to be charged express company by railroad.

In mandamus to compel railroad to furnish express company facilities under Rev. St. 1911, arts. 6616, 6617, court was not empowered to determine what constituted a reasonable rate ·for such facilities; the establishment of rates being a legislative and not a judicial function.

2. Carriers ⊛10 — Subject to regulation by states creating them.

Common carriers being created for public purposes are subject to regulation by the states creating them under certain defined constitutional limitations, such regulation including the matter of facilities and the fixing of rates.

3. Carriers ⊛12(5), 15—Courts may pass on reasonableness but cannot ·establish facili- ·ties and rates.

Courts may inquire into the reasonableness of the requirements as to facilities and of the rates as fixed, and if found unreasonable restrain their enforcement; but they cannot go further and determine facilities and establish rates deemed reasonable, the establishment of facilities and rates being a legislative function.

4. Carriers ⊛12(7)—Reasonableness of rate to express company not determinative of reasonableness as to another company.

That railroad had made contract with express company fixing its rate for facilities furnished the company at certain per cent. of its gross receipts with a guaranteed minimum payment did not estop it from denying reasonableness of similar rate fixed by court for facilities to be furnished another express company doing a much smaller business in a much smaller territory without such a guaranty as to minimum payment, since such rate might be reasonable as to the one company and not reasonable as to the other in view of difference in the extent and nature of the business of the two companies.

5. Carriers ⊛15—Constitutional law ⊛70 (1)—Court in enforcing rate established by a contract cannot vary from contract.

To enforce a rate claimed to be established by a contract between express company and railroad company, the decree must follow the contract in its entirety, and any substantial variation therefrom, and substitution therefor, of the court's judgment, would be the fixing of the rate by the court in usurpation of a legislative function.

6. Carriers ⊛15—Express company must demand facilities with tender of proper rate, to be entitled thereto.

Express company to be entitled to facilities by railroad under Rev. St. 1911, arts. 6616, 6617, must make a demand therefor with payment or tender of the proper rate.

7. Carriers ⊛15—Express company's tender of contract held insufficient to require railroad to furnish facilities.

Railroad was under no obligation to furnish express company facilities under Rev. St. 1911, arts. 6616, 6617, though contract tendered by express company called for same per cent. of gross rates as was provided for by the railroad's contract with another express company, where latter company did a big interstate business and its contract guaranteed a minimum payment, and where contract tendered contained no such guaranty and contemplated only intrastate business.

8. Carriers ⊛15—Express company held not entitled to expenditures made in belief that it would be permitted to conduct business over defendant railroad's line.

That railroad accepted from express company, which had applied for facilities, certain trucks necessary in the conduct of plaintiff's business for free distribution, issuing its bill of lading therefor with notation, "Deadhead account of contract pending," did not entitle express company, upon railroad's refusal to permit the company to do an express business over its line, to recover as damages expenses incurred in the belief that such permission would be granted, where express company made the notation and knew that at such time there was no contract pending.

9. Carriers ⊛15—Railroad held not estopped to decline to enter into contract with express company by·reason of notation on bill of lading.

Railroad would not be estopped to decline to enter into a contract with express company because of its acceptance for free distribution of certain trucks necessary in the conduct of the express company's business and issuance of bills of lading therefor with notation, "Deadhead account pending."

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by the Empire Express Company against the Missouri, Kansas & Texas Railway Company of Texas and another. Judgment for plaintiff was affirmed by the Court of Civil Appeals (173 S. W. 222), and defendants bring error. Judgment of Court of Civil Appeals reversed and judgment rendered for defendants.

---

⊛For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Chas. C. Huff and A. H. McKnight, both of Dallas, Dinsmore, McMahon & Dinsmore, of Greenville, and Baker, Botts, Parker & Garwood, of Houston, for plaintiffs in error.

Collins & Cummings, of Hillsboro, J. E. Gilbert, of Dallas, and Clark & Leddy, of Greenville, for defendant in error.

SONFIELD, P. J. The Empire Express Company, plaintiff, brought this action against the Missouri, Kansas & Texas Railway Company of Texas, hereinafter called the railway company, and the American Express Company, hereinafter called the express company, seeking the issuance of a writ of mandamus requiring the railway company to permit plaintiff to do an express business over its lines of railway in Texas, to enjoin the express company from interfering with plaintiff in conducting such business, and seeking recovery of damages, actual and exemplary, from the railway company. The suit is based upon the act of 1887, constituting articles 6616 and 6617, R. S. 1911, reading as follows:

"Art. 6616. Every railroad company operating a railroad within this state shall furnish reasonable and equal facilities and accommodations, and upon reasonable and equal rates, to all corporations and persons engaged in the express business, for the transportation of themselves, agents, servants, merchandise and other property, and for the use of their cars, depots, buildings and grounds and for exchanges at points of junction with other roads.'

"Art. 6617. Any railroad company, which shall fail to comply with the provisions hereof, shall be liable to the aggrieved party, in an action on the case, for damages; and such railway company, in addition to liability to said action for damages, shall be subject to a writ of mandamus, to be issued by any court of competent jurisdiction, to compel compliance with the provisions of the preceding article; and the said writ of mandamus shall issue at the instance of any party or corporation aggrieved by a violation hereof, and any violation of said writ shall be punishable as a contempt."

Plaintiff alleged that under the statutes of the state of Texas it is given the right to conduct an express business upon any line of railroad within the state, upon reasonable and equal rates with any other express company, and that any railroad in the state is required to furnish plaintiff reasonable and equal facilities and accommodations, upon reasonable and equal rates as it does to other express companies, engaged in the express business on the line of such railroad; that it is the usage and custom of railways within the state to furnish facilities and accommodations to express companies, for the conduct and operation of the express business over their several lines of railroad, upon a percentage basis of the gross earnings derived from the conduct of the express business over such lines; that the percentage of gross earnings, paid by the several express companies to the various railroad companies over whose lines they operate, varies from 40 to 55 per cent. of such gross earnings on freight and merchandise transported, and 25 per cent. on money transported by the express companies; that it is usual to pay such percentage of gross earnings within 30 to 120 days after the expiration of each month of operation; that in some instances an advance payment is agreed upon between the railroad and express company, and in other instances no such advance payment is made; that at the time of the filing of this suit there was in existence a contract in writing between defendants, whereby, for the facilities therein specified, the express company paid the railway company 55 per cent. of its gross earnings, except on money, on which it paid 25 per cent. It was further alleged that on February 12, 1913, plaintiff tendered to the railway company a written contract, which it offered to execute, the contract being attached to its petition, and which contract was declined by 'the railway company, without stating the reason therefor, and without offering to negotiate with plaintiff concerning the making of a contract; that thereafter, on or about the 26th day of May, 1913, plaintiff tendered the railway company two contracts, attached as exhibits to its petition.

It is further alleged that by a supplemental petition, filed on June 4, 1913, in addition to the three contracts above referred to, which plaintiff had tendered and offered to execute, it then offered to enter into any reasonable contract with the railway company, and to execute any of the three contracts referred to, or a new contract, each of which should run for a period of 10 years from date, or for any other reasonable term; or that it would enter upon and conduct its express business on the lines of the railway company without any express contract in writing or other stipulation than the terms of article 6616, R. S. 1911, but that the railway company had continuously refused, and still refuses, to enter into any of the contracts tendered or any contract upon any terms, with plaintiff, whereby plaintiff might conduct an express business over the railway company's lines, and has refused to grant it the same facilities and accommodations, upon the same rates that it charges the express company for like service, or upon any rates. It was further alleged that the railway company received for free distribution certain trucks to be used by plaintiff in the conduct of its business, and thereby induced plaintiff to believe that it would be permitted to go on the railway company's lines to conduct an express business; and, relying on such action, plaintiff incurred expenses in the purchase of horses and equipment, the hiring of agents, renting of offices, etc.; that, by rea-

son of the refusal of the railway company to permit it to go on its lines, it was deprived of profits, which it could have earned, in the sum of $10,000 per month for five months; that it was also deprived of the value of the use of certain horses and wagons; and, further, that a conspiracy to prevent its doing business existed between the railway company and the express company; and the conduct of the railway company in keeping it off the line was willful and malicious. Plaintiff prayed for the recovery of damages, actual and exemplary, and for a writ of mandamus "commanding and compelling the defendant railway company to furnish to this plaintiff reasonable and equal facilities, and accommodations upon reasonable and equal rates that it has been and is furnishing to the American Express Company, and that this court determine what is a reasonable rate for such facilities to be paid by the plaintiff to the railway company," and for an injunction against the express company, restraining it from interfering in any way with the plaintiff, its agents and employés, in the conduct of its express business over the lines of the railway company.

Defendants demurred generally to the petition, and by special exceptions, and in their answers, attacked the validity of the act of 1887. The general demurrer and all exceptions were overruled.

The case was tried to a jury, and submitted on special issues. Upon the findings of the jury, judgment was rendered in favor of plaintiff against the railway company, for damages, actual and exemplary, in the sum of $45,892.46, with interest, and awarding plaintiff a writ of mandamus against the railway company and a writ of injunction against the express company, as prayed for. On appeal, the judgment of the district court was affirmed, 173 S. W. 222.

The writ of mandamus required the railway company to immediately furnish plaintiff such reasonable facilities and accommodations, for the transportation of plaintiff's agents, servants, merchandise, and other property, and all merchandise and other property to be transported by plaintiff in pursuing an express business as a common carrier, and for the use of the railway company's cars, depots, buildings, and grounds, and for exchange at points of junctions with other roads, as the railway company is now furnishing, or shall hereafter, while the judgment is in force, furnish, to any other express company over its lines, for the same service and the same character of business, between the points within this state only. The decree provides that—

"To more clearly and specifically define the rights and duties existing under this decree covering the transaction of said business by the plaintiff over the lines of the defendant rail-way company, it is * * * further ordered, adjudged, and decreed by the court as follows."

There follow 15 paragraphs, defining minutely the business relations and the manner of conduct of the business between plaintiff and the railway company, following as closely as possible the provisions in the contract between defendants. It provides that plaintiff, as compensation for the facilities, accommodations, services, rights, and privileges therein specified, shall pay to the railway company 55 per cent. of the gross revenues derived by plaintiff on all business transacted by it over the railway company's lines, the minimum amount to be paid the railway company to be at least equal to the sum of $60,000 per year, and a proportionate sum for the fraction of any year, should any such fraction of year obtain while the decree is in force; prescribes the time and manner of making such payments, and what shall constitute gross receipts. The last section provides that—

The decree "shall be effective and continue in force, until such time as the defendant Missouri, Kansas & Texas Railway Company of Texas shall file in this cause a statement of its readiness and willingness to enter into a contract with the plaintiff, substantially in the terms of either of the proposed contracts annexed to the plaintiff's petition, and containing the additional matter or modification contained in this order, or if at any time plaintiff and said defendant shall enter into a contract for the service required, then, and in either event, this order for mandamus shall cease to be of any force."

In 1885, the Supreme Court of the United States, in Express Company Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791, held that railroads were not obliged, either by the common law or by usage, to do more, as express carriers, than to provide the public at large with reasonable express accommodations, and need not, in the absence of a statute, furnish to all independent express companies equal facilities for doing an express business upon their passenger trains. The act of 1887 was passed to meet this decision and to remedy what the Legislature deemed a defect in the existing law. State v. M., K. & T. Ry. Co. and Am. Exp. Co., 99 Tex. 516–525, 91 S. W. 214, 5 L. R. A. (N. S.) 783, 13 Ann. Cas. 1072. Under this act, assuming its validity, if a railroad company extends facilities to one express company for the transaction of an express business over its lines, it must extend reasonable and equal facilities to all other express companies desiring to do business thereon, at reasonable and equal rates. In such case, express companies are placed in the same attitude toward the railroads, in the matter of facilities and rates, as an ordinary shipper. In this connection, with a view to a proper construction of the act of 1887, it should be borne

in mind that at the date of the passage of the act, and prior to the creation of the Railroad Commission, carriers were permitted to discriminate in rates, provided the circumstances were not such as to make the discrimination unjust. Railroad Commission v. Weld & Neville, 98 Tex. 394–404, 73 S. W. 529. The act of 1887 sought only to prevent unjust discrimination on the part of railroads against express companies. It does not require that the facilities furnished and the rates charged be equal in the absolute sense. Absolute equality is not required in all cases, for circumstances and conditions may make this unreasonable, and reasonableness as well as equality is required. The facilities and rates must be equal, in the sense that they are to be in just proportion in view of the necessities, the character, and consequent extent of the business; and reasonable in the sense that the rate charged is not more than a fair compensation for the services rendered. Railroad Commission v. Weld & Neville, supra.

[1] The act does not specify the facilities or fix the rates, but merely provides that they shall be reasonable and equal. At the date of its passage, there was no board or commission of any character, authorized to determine facilities and fix rates. The Railroad Commission, subsequently created, if vested with such power as between railroads and express companies, has not assumed to exercise it. From the fact that contracts between railroads and express companies are required, under the orders and rules of the Railroad Commission, to be filed with that body, the filing of such contracts cannot, as contended for by plaintiff, be regarded as a determination of the facilities and a fixing of rates by the commission. Whatever rights are sought to be conferred upon express companies under this act cannot, of course, arise until there has been a demand for facilities and accommodations, and payment or tender of the proper rate. The rate must therefore be fixed in some manner. Not having been fixed by the Legislature, or by any legislative agency, board, or commission, was it within the province of the court, in response to the prayer of plaintiff's petition, "to determine what is a reasonable rate for such facilities to be paid by plaintiff to the railway company." We think not.

[2, 3] Common carriers, being created for public purposes, are subject to regulation by the states creating them, under certain defined constitutional limitations. Regulation includes the matter of facilities and the fixing of rates. The common-law regulation of carriers may be amended or changed in like manner as any other common-law rule; but this is a legislative, not a judicial, function. Courts may inquire into the reasonableness of the requirements as to facilities and of the rates as fixed, and, if found unreasonable, restrain their enforcement; but

they cannot go further, and determine facilities and establish rates deemed reasonable. Whether a rate fixed and established is reasonable and equal is a proper question for judicial determination; but what would be a reasonable and equal rate, and the promulgation of such rate, is legislative in its character. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; St. L. & S. F. Ry. Co. v. Gill, 136 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; Railroad Commission v. Weld & Neville, supra.

Plaintiff insists that the court did not, through the decree herein, fix or establish a rate, but merely enforced a rate theretofore validly fixed by defendant railway company itself. This is based upon the proposition that, conceding authority in the Railroad Commission to determine the matter of facilities and to establish rates between railroad and express companies, in the absence of action by the commission, such companies have the right to contract for certain facilities upon a certain rate. The railway company having through contract fixed 55 per cent. of the express company's gross receipts, derived from business over the railway company's lines, as reasonable compensation for facilities furnished the express company, it is estopped to deny the reasonableness of the rate and that same is not a sufficient compensation to be paid by plaintiff for the same facilities; and under the act it became the duty of the railway company to furnish plaintiff the same facilities at this same rate.

[4] We have no doubt of the correctness of the contention that, in the absence of action by the Railroad Commission, defendants were within their right in contracting for facilities to be furnished the express company, and the rate to be paid therefor to the railway company; but we cannot agree with plaintiff's statement of the terms or the effect of such contract.

If it be true that the contract fixed the rate at 55 per cent. of the gross receipts of the express company, and that such rate as between these parties was reasonable, it does not follow that such rate would be reasonable and equal when applied to plaintiff. The facilities required to be furnished plaintiff being the same as furnished the express company, it cannot be questioned that the railway company is entitled to receive from plaintiff the same compensation as paid by the express company. To yield the same compensation received from the express company, through the percentage division of 55 per cent. of its gross receipts, it might, and under the evidence unquestionably would, be necessary to require a larger per centum of plaintiff's gross receipts. This could hardly be held in any sense a discrimination in rates. It certainly would not be an unjust

221 S.W.—38

discrimination, for the rate, in the last analysis, is the compensation in money and services received by the railway company. Percentage divisions must, of necessity, be based upon the extent and volume of business. The record discloses that, at the time of the execution of its present contract with the railway company, the express company was engaged in both intrastate and interstate business. Its organization was strong and far-reaching; its business thoroughly established, and conducted over a vast mileage of railway. As a result, it was able to route over the railway company's lines a great volume of business, and 55 per cent. of its gross receipts over the railway company's lines netted the railway company an amount in excess of the guaranteed minimum payments provided for in the contract. On the other hand, plaintiff had no established business of any character, and was limited to intrastate business. It did not intend to, and could not, do an interstate business. The business it would transact, if admitted over the railway company's lines, was an unknown quantity, entirely problematical.

From plaintiff's printed argument in this court we quote the following:

"The evidence shows that of the business done by it (defendant express company) on the railway company's lines, only 52 per cent. is intrastate. It also shows that the most our client could hope to do, at least for some time to come, would be to divide the local business, or do 26 per cent. of the business now being conducted by the other company."

By what process of reasoning can the conclusion be reached that 55 per cent. of the gross receipts of plaintiff, under the above statement, would be the same rate or compensation as paid by the express company through this percentage division?

But 55 per cent. of the gross receipts was not the rate fixed under the contract. The railway company was to receive this per centum with a guaranteed minimum payment of $240,000 per year; and, in addition thereto, the express company was to render certain specific services. If, as insisted by plaintiff, the contract may be taken as establishing a rate, the rate so established was the compensation in money and services to be paid and rendered the railway company. The limit of the court's power, in such case, would be to compel the railway company to furnish plaintiff the same facilities upon the same rate; that is, 55 per cent. of its gross receipts, with a guaranteed minimum payment of $240,00 per year, together with like services contracted to be rendered the railway company by the express company. Had such decree been rendered, it might, with a degree of plausibility, have been justified upon plaintiff's theory that the court did not thereby fix a rate, but enforced the rate fixed by the railway company itself, which

the court found reasonable and equal when applied to plaintiff. But such is not the decree entered herein. The railway company is compelled thereunder to furnish plaintiff the same facilities, and the compensation to be received by it is 55 per cent. of plaintiff's gross receipts, with a minimum payment of $60,000 per year, together with certain services to be rendered the railway company; being as nearly the same as those rendered by the express company as plaintiff would be in a position to perform. It is thus apparent that the same facilities are to be furnished plaintiff for a concededly less amount of compensation.

[5] It is urged by plaintiff that the undisputed evidence establishes that the receipts from the express company always exceed the guaranteed minimum payment, and such payment is therefore of no real or substantial value, and the rate the express company in fact pays is exactly the same as plaintiff is required to pay, to wit, 55 per cent. of its gross receipts. We cannot follow this reasoning. The railway company under its contract is to receive in money at least $240,000 per year from the express company. It may receive more, but in any event must receive that much. Under the terms of the decree, the railway company is to receive from plaintiff at least $60,000 per year, with no assurance of more. This minimum amount was fixed by the court on the basis of the amount of business plaintiff could hope to transact over the railway company's lines, in proportion to that transacted by the express company. It is evident, therefore, that the court through its decree did not enforce a rate fixed, but, from the rate so fixed, established a proportionate rate. To enforce a rate claimed to be established by the contract, the decree must follow the contract in its entirety. Any substantial variation therefrom, and substitution therefor, of the court's judgment, would be the fixing of the rate by the court.

It is urged by plaintiff that the act of 1887 does not contemplate that every express company shall pay as large a total sum for the transaction of its business as any other express company, but only that it shall pay the same proportionate rate for the handling of its express matter; that the purpose of the act was to destroy monopoly, and to require the payment of a like total sum would defeat the object of the act, in that only a company with an established business could pay such an amount.

This may be true, but it does not alter the fact that the fixing of the "proportionate rate" is for the Legislature. Courts will go far in an effort to effect the purpose of a legislative act; but to this end they cannot transcend their constitutional power, and usurp a legislative function.

We find ourselves in agreement with the

proposition submitted by defendants, that the term "rate," as used in the act, necessarily contemplates a fixed amount of compensation for a definite unit of service; that, in prescribing reasonable and equal rates, no such complex arrangement as is sought by the plaintiff in this case, and awarded to it by the court's decree, was in contemplation. If, for instance, the Legislature, or a legislative agency, had fixed a sum which express companies should pay for a definite amount of space on each railway passenger train, or a fixed rate for each 100 pounds of express matter carried, on a mileage basis, and a fixed amount for the carriage of each of its messengers and agents; a definite and precise duty, calling for the exercise of no discretion, would be imposed upon the railway company toward plaintiff, which the court could enforce through mandamus. The decree in this case in effect makes a contract for the parties; a contract, not identical with that existing between defendants, but with substantial variations therefrom, vitally affecting the railway company, not only as to compensation, but in other matters not necessary to enumerate. The court made for the parties, "such a contract for the business as in its opinion they ought to have made for themselves"; and this the court was without authority to do. Express Company Cases, supra.

[6, 7] As before stated, whatever rights are sought to be conferred upon express companies by the act of 1887, they cannot arise in favor of any express company until there has been a demand for facilities and the payment or tender of the proper rate. The demands and tenders of plaintiff were made through the contract submitted by it to the railway company. The first of such contracts provided for payment of 50 per cent., the others for 55 per cent., of the gross receipts. None of the contracts so tendered provided any guaranteed minimum payment, and each contract contemplated only an intrastate business. Conceding that the contract between defendants fixed the rate, the rate so fixed was essentially different from that tendered by plaintiff. This being true, the railway company was under no obligation to furnish the facilities; and its refusal so to do gave plaintiff no right to the issuance of a writ of mandamus and no cause of action for damages.

It appears that the railway company accepted for free distribution, at Dallas and Houston, certain trucks necessary in the conduct of plaintiff's business, issuing its bills of lading therefor with the notation: "Deadhead account of contract pending."

[8] Under the jury's findings, plaintiff was thereby induced to believe that it would be permitted to go upon the railway company's lines to conduct an express business, and acting thereon plaintiff made expenditures and incurred expenses aggregating the sum of $14,068.65. This amount plaintiff asserts it should in any event recover. We cannot so hold.

The undisputed evidence establishes that the trucks were delivered to the railway company in Dallas on April 17th, and in Houston on April 23d. The first contract tendered by plaintiff was rejected by the railway company on March 8th, which was prior to such deliveries; and the second and third contracts were submitted on May 26th, which was subsequent to such deliveries. Plaintiff's president testified that, after the rejection of the first contract by the railway company, plaintiff did not propose, offer, or tender any other contract, until after the delivery of the trucks. Plaintiff's superintendent testified that the railway company had never at any time indicated any desire or any sort of willingness to accept any business from plaintiff. Plaintiff pleaded that the contracts were rejected without any offer to negotiate with reference to rates or terms upon which it would be admitted on the railway company's lines. There is absolutely no evidence of any negotiations between the parties in the interim between the rejection of the first contract and the submission of the subsequent contracts. There was therefore no contract pending at the date of the issuance of the bills of lading for the trucks, and this was well known to the plaintiff.

[9] If the notation "contract pending" expressed the truth, and for this reason the trucks were received for transportation without charge, this would not justify belief on the part of plaintiff that it would be admitted on the railway company's lines and reliance thereon in making expenditures. The only meaning which could attach to the notation and act was that, pending a contract, the railway company would transport the trucks which, in the event of a contract, would be required by plaintiff in the conduct of its business. There was recognition of the need of a contract, and that a contract was pending, but not consummated. The railway company was not thereby committed to the contract pending, or to any other contract. It surely could not be held estopped to decline to enter into a contract because of its declaration that a contract was pending; that is, that there were negotiations looking to a contract.

The bills of lading were prepared by plaintiff; it made the notation; it sent an agent to Dallas and Houston to procure the execution of the bills of lading, with instructions to insist that the notation be incorporated. Through the execution of the bills of lading, the railway company but acquiesced in a statement made by plaintiff, and known by plaintiff to be false. How, then, could plaintiff have been misled thereby?

We are of opinion that the judgment of the

Court of Civil Appeals should be reversed, and judgment here rendered for defendants.

PHILLIPS, C. J. We approve the judgment recommended in this case.

───────────────

ⓒ═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes